Hildegarde NAVIS, individually, and as the natural parent and guardian of Peter Navis, Timothy Navis, and Dawn Navis, Plaintiffs,

v.

FOND DU LAC COUNTY; Fond Du Lac Department of Social Services; Sandy Tryon, individually, and in her official capacity as social worker for the Fond du Lac County Department of Social Services; Catherine Pipping, individually, and in her official capacity as social worker for the Fond du Lac County Department of Social Services; Cindy Champeau, individually, and in her official capacity as social worker for the Fond du Lac County Department of Social Services; Lee Salzmann, individually, and in his official capacity as intake worker for the Fond du Lac County Department of Social Services; Theodore Morrison, individually, and in his official capacity as Supervisor for the Fond du Lac County Department of Social Services, Defendants.

No. 88–C–362.

United States District Court, E.D. Wisconsin.

Aug. 30, 1989.

David E. Lasker, Julian, Olson & Lasker, Madison, Wis., for plaintiffs.

Daniel R. Riordan, Raymond J. Pollen, Riordan, Crivello, Carlson & Mentkowski, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

CURRAN, District Judge.

### BACKGROUND

Howard and Hildegarde Navis were married in March of 1955, which marriage produced eleven children. The Navises lived on a farm but frequently both Hildegarde and Howard sought employment off the farm to supplement the family's income. In November of 1984, seven of the Navis children had reached their majority and the four minor children, Faith, age seventeen; Peter, age thirteen; Timothy, age eight; and Dawn, age five were still in school. Howard and Hildegarde had been having difficulty in their marriage and had been in counseling for approximately two years.

On November 28, 1984, Faith told her guidance counselor at school that she had been the subject of sexual abuse by her father. The guidance counselor immediately informed the Fond du Lac County Department of Social Services of this allegation and Sandy Tryon, Fond du Lac County DDS employee interviewed Faith at the high school on that same day. During the course of the interview they not only dis-

cussed the sexual abuse but Faith's allegations that the other children were being neglected. Two days later Tryon met individually with the remaining three Navis children at their school. Apparently the children complained that their parents weren't home much and, according to Tryon's notes, Peter indicated that he wanted to live with his adult sister Carolyn.

On December 6, 1984, Tryon and Fond du Lac County Sheriff's Deputy David Faucher interviewed the adult children, Beth Navis, Carolyn Leahy, Debra Soll, and Dan Navis, along with Faith. These interviews were conducted individually at the Department of Social Services. According to Tryon these interviews supported her concern that the children were the subject of neglect or inadequate supervision and that Mr. Navis had had "sexual contact with most of the older girls, showing a pattern of potential danger for Dawn." (Tryon deposition at page 79)

The following day, December 7, 1984, Detective Faucher submitted "temporary physical custody requests" for the four minors to the Juvenile Intake Division of the Fond du Lac County Children's Court. With the requests for temporary physical custody, Detective Faucher submitted the results of the interviews with Beth Navis, who was twenty-nine at the time, and who stated that her father had attempted intercourse with her many times when she was eleven or twelve years old. He submitted the results of his interview with Carolyn Leahy, who was twenty-seven at the time, and stated that she had been the victim of sexual abuse by her father and that the children were neglected by the mother. Carolyn also insinuated that her mother had engaged in inappropriate sexual behavior. The interview with daughter Debra Soll, who was a few weeks shy of twenty-seven at the time, indicates that she also was the victim of her father's sexual abuse, as has been her mother's sister Ruth. Faucher also included the results of his interview with Daniel Navis, age twenty-one, who complained that his mother was rarely at home and paid no attention to the children when she was. He also related how he had been beaten with a leather dog leash by his mother when he was fourteen or fifteen years old. Finally, Faucher submitted what appears to be the verbatim interview with Faith Navis who related a horror story of sexual abuse by her father from the time she had been a young child. Faith also told a story of neglect, including being beaten with a leather strap several years in the past.

Defendant Lee Salzmann was the Juvenile Intake worker on duty at the time Detective Faucher filed his request. In Fond du Lac County, Juvenile Intake is a function of the Fond du Lac County Circuit Court with Judge Steven Weinke as its Head. Salzmann's position requires him to determine if probable cause exists to believe that minors are being subjected to abuse or neglect and thus in need of protection or services. Upon receipt of the request, Salzmann interviewed both Faucher and Tryon and also spoke to the daughters, Debra Soll and Carolyn Leahy before authorizing the taking into custody of the minor children on December 7, 1984. Salzmann set the matter for a post-deprivation detention hearing on Monday December 10, 1984.

In his custody request regarding Dawn, Salzmann noted as follows: "Long history of physical and sexual abuse in the family. Dawn is exhibiting some strong emotional problems. Siblings feel Dawn should be removed." As to Peter, Salzmann noted as follows: "Peter has not been receiving the necessary care required. In one situation he was playing with gasoline and got burnt [sic]. A history of physical & sexual abuse in the family." As to Timothy, Salzmann noted: "History of physical and sexual abuse within the family. Other siblings feel Timothy should be removed. Not receiving the care he requires."

On that same date, Sandy Tryon called Mrs. Navis at work informing her that her minor children were being removed because of allegations concerning sexual abuse and neglect. Tryon also called her later that evening to discuss the matter further.

The matter came before the Honorable Henry B. Buslee on December 10, 1984, with attorney Anthony Sanfelippo appearing as guardian ad litem and Mrs. Navis present in court. Sandy Tryon explained that Faith had been placed with her older sister Debbie Soll and that the two boys and Dawn were with their older sister Carolyn Leahy. She further explained that she was looking into having Mrs. Navis' sister take care of Dawn and that she had "talked with Mrs. Navis this morning and explained ... the plans ... [and that Mrs. Navis] is agreeing with what has happened right now." Mrs. Navis was silent in the face of this representation. At the time Mr. Navis was in jail.

The CHIPS' petitions were filed and the matter, with respect to all four children, came on for a plea hearing on January 8, 1985, again before Judge Buslee. Hildegarde Navis appeared by her attorney Michael Furtado. Howard Navis was present with his attorney. Dawn and Timothy appeared by their guardian ad litem, attorney Sanfelippo and Faith and Peter appeared by their guardian ad litem, Barbara Michalski. Sandy Tryon was also present. The two guardians ad litem admitted the allegations in the petitions that the children were in need of protection and services. Counsel for Mrs. Navis also admitted the allegations in the petition and counsel for Howard Navis denied the allegations. The matter was set for a dispositional hearing and the court ordered psychiatric evaluations of the children and the parents. The court continued placement of the children as follows: Peter and Timothy were placed with their sister Carolyn Leahy; Faith was placed with her sister Debra Soll; and Dawn was placed with her maternal aunt, Ruth Lindegarde.

On January 9, 1985, Hildegarde Navis commenced divorce proceedings and filed an "affidavit supporting order to show cause or motion for temporary relief." She indicated her "desire" to receive custody of the minor children but "acknowledge[d] that the children have been removed from the premises occupied by herself and her husband based upon the fact that the respondent has been charged with alleged sexual child abuse and that she has neglected the minor children." She requested maintenance so that she could "remove herself from the farm premises to secure her own living accommodations...."

On January 28, 1985, the matter again came before Judge Buslee for fact finding, with Mrs. Navis appearing by attorney Mike Sias. The psychological examinations had not yet been completed, however, and the matter was postponed.

In February of 1985, the case was passed on to the Juvenile Court Unit of the Department of Social Services, which unit was supervised by defendant Theodore Morrison. Morrison assigned the case to defendant Catherine Pipping.

The fact finding hearing was conducted on April 8, 1985, with both parents present and represented by counsel. Howard Navis changed his position and entered an admission to the petition except for an allegation of sexual abuse regarding Dawn, which allegation was subsequently struck. Catherine Pipping recommended "that the situation remain status quo, with all the children remaining in the placements and all scheduled for counseling and that they participate in counseling" and all parties agreed, including counsel for Mrs. Navis.

The matter was scheduled for a dispositional hearing which occurred on April 30, 1985. Again, Mrs. Navis was in court and also appeared by counsel. Corporation Counsel Dennis Kenealy, appearing on behalf of the County of Fond du Lac, Department of Social Services, recommended that placement of Faith continue with her sister Debra until her eighteenth birthday in June of 1985. He recommended that legal custody of Peter and Timothy be transferred to the Department for one year with placement to continue with their sister Carolyn Leahy. He further recommended that custody of Dawn be transferred to the Department for a year with placement to be continued at her aunt's residence. Finally he recommended that all four children participate in individual and family counseling and that Mr. and Mrs. Navis also undergo individual and family counseling. Counsel

for Howard Navis recognized that his client might be incarcerated for the next six months and he thus concurred in the recommendation regarding transfer of custody for a year. Counsel for Mrs. Navis, however, argued to the court that the divorce between the Navises might be concluded within six months, at which point he indicated that Mrs. Navis would like to try to regain custody. The two guardians ad litem concurred with the County's recommendations regarding the transfer of custody and the period of time. The court adopted the County's recommendation on all three factors—custody, placement and counseling.

On December 27, 1985, counsel for Hildegarde Navis wrote to Catherine Pipping expressing dissatisfaction with the limitations on visitation and the Department's failure to keep Mrs. Navis fully apprised as to the children's school progress and health problems. He further informed Ms. Pipping that Mrs. Navis intended to regain custody of her children but that "[s]he does feel, however, that it would be in the best interests of the children not to pursue regaining custody until such time as her divorce from Howard is finalized."

In February of 1986, Catherine Pipping filed petitions for extensions of the dispositional order as to each of the three minor children. In each case she recommended that legal custody remain with the Department for another year with placement to continue as in the original orders. At the hearing on the petitions for extension the guardians ad litem chose not to contest the extensions nor did Mr. Navis. Mrs. Navis, however, represented that she did wish to contest the extension and the matter was set for a hearing.

On July 1, 1986, an evidentiary hearing on the contested extension was conducted before the Honorable Eugene F. McEssy. Mrs. Navis appeared in person and by attorney Bruce Elbert. Attorney Elbert admitted that it would not be "practical or healthy" to reunite the two boys with their mother at that time but argued for the reunion of Dawn with Mrs. Navis. Mr. Sanfelippo, as guardian ad litem for Dawn,

argued for the extension of the status quo while recognizing the strides which Mrs. Navis had made in returning emotionally and physically to the family. He did not recommend the return of Dawn to Mrs. Navis, expressing the conviction that it would be in neither's best interest at that time. He did predict, however, that "at some point in the future ... given Mrs. Navis' motivation, there may be a time when Dawn can be successfully returned." (Hearing transcript at page 84) The court accepted the recommendation of the guardian ad litem with respect to Dawn and ordered the custody continued for a year. Since there was no disagreement with respect to the boys, their custody also was continued for a year.

The following August, at the request of Mrs. Navis, her file was transferred to defendant Cindy Champeau. It appears that Catherine Pipping continued to supervise the children's files.

Although the divorce of Hildegarde and Howard became final on September 3, 1986, the matter of the custody of the minor children remained open because of the CHIPS' custody orders. Prior to the expiration of the extension order, Dawn was returned to her mother in March of 1987. Howard and Hildegarde agreed that custody of Dawn could remain with the mother. A custody dispute, however, arose between the parents with respect to Peter and Timothy. After conducting hearings on October 13, 1987, and November 30, 1987, Family Court Commissioner Robert V. Fowler awarded custody of the two boys to their mother. In his decision the Commissioner weighed the evaluations of the father's experts who characterized the mother as having "a passive-aggressive personality disorder that has resulted in her physical and mental abusive behavior toward the children. Further, that she is negative, argumentative, vindictive and retaliatory. All of which prevents her from exercising the proper parenting abilities." Against this profile was the characterization of the father who was an admitted and "known sexual abuser of his own daughters, as well as others outside the family. Furthermore, that he has been di-

agnosed as being untreatable due to his unwillingness to admit his wrongdoing and that because of his schizoid personality, any continued relationship with the boys would result into [sic] the children assimilating the same personality traits." In awarding custody to the mother, the Commissioner ordered that she continue parental counseling.

The present action was commenced on April 6, 1988, by Hildegarde A. Navis, individually and as the parent and guardian of Peter, Timothy and Dawn, against Fond du Lac County, the Department of Social Services, the three social workers, individually and in their official capacities, the supervisor of the department, individually and in his official capacity, and the intake worker, individually and in his official capacity.[1] Federal jurisdiction was premised on 42 U.S.C. § 1983, along with various pendent state claims for "professional negligence, malfeasance, misfeasance and nonfeasance and intentional infliction of emotional harm."

The claim under section 1983 is that the defendants, while acting under color of state law, "removed plaintiffs Peter Navis, Timothy Navis, and Dawn Navis from the custody, care, and control of plaintiff Hildegarde A. Navis without a hearing, without a diligent investigation to determine if the children were in need of protection or services, without a visit to the children's home or usual living quarters, without an interview with the children's parents, without offering to provide plaintiffs appropriate services or to make arrangements for the provision of services, and without reasonable grounds for determining that the children required emergency or immediate protection." This matter is before the court on the defendants' motion for summary judgment.

## DECISION

In seeking summary judgment it is traditionally the burden of the moving party to satisfy the court that no genuine issue of material fact exists which would preclude granting a judgment as a matter of law. *Cedillo v. International Association of Bridge, etc.,* 603 F.2d 7, 9–10 (7th Cir.1979). All inferences drawn from the record before the court must be resolved in favor of the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Morgan v. Harris Trust & Savings Bank,* 867 F.2d 1023 (7th Cir.1989). The court is not permitted to weigh evidence and must give the nonmoving party the most favorable view of the record if there is doubt as to the sufficiency of factual showings. *Exxon Corp. v. Federal Trade Commission,* 663 F.2d 120, 126 (D.C.Cir.1980).

Presuming, however, there has been an adequate time for discovery, the nonmoving party similarly bears the burden of coming forward with a showing sufficient to establish that at least a genuine issue of material fact exists with respect to each essential element which the nonmoving party would be required to prove at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence produced by the nonmoving party need not be in a form that would necessarily be admissible at trial but must, at the very least, be sufficient to show that a triable issue exists. *Id.* In reviewing the evidentiary materials the district court is not required to evaluate every conceivable inference but only reasonable ones. *Parker v. Federal National Mortgage Association,* 741 F.2d 975, 980 (7th Cir.1984). The standards for ruling on a summary judgment motion are identical to those which govern a trial judge in the determination as to whether to direct a verdict, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and thus the purpose of summary judgment is to avoid unnecessary trials where it is clear from the record that no triable issue exists. *Moore v. Marketplace Res-*

---

1. James Stafford, another supervisor for the Fond du Lac County Department of Social Services, was also one of the original defendants who was later dismissed by stipulation. An amended complaint also added two of the court appointed doctors who are also dismissed by stipulation and order of the court.

*taurant, Inc.,* 754 F.2d 1336, 1339 (7th Cir.1985).

The defendants focus their challenges on a variety of legal theories, several of which clearly have merit. They argue that the plaintiffs had a full opportunity to litigate these issues in the CHIPS' proceedings and this collateral attack is barred by the principles of res judicata and collateral estoppel. They argue that the plaintiffs have failed to articulate a constitutional deprivation, thus failing to state a federal claim. They invoke absolute or qualified immunity as to the individual defendants. They argue that the plaintiffs have failed to state a claim against the governmental entities and that they have failed to present any evidence of conspiracy.

█ It is beyond dispute that the plaintiffs have a liberty interest in the relationship between the natural parent and the children. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). This interest, however, must be weighed against the competing governmental interest in separating neglectful or abusive parents from their children. *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972). The question is thus whether Hildegarde Navis and her minor children suffered a deprivation of their rights under the due process clause when the children were removed without a predeprivation hearing.

█ In this circuit it is clearly established that social workers performing discretionary functions are protected against suits for damages on the ground of qualified immunity. *Doe v. Bobbitt,* 881 F.2d 510 (7th Cir.1989); *Darryl H. v. Coler,* 801 F.2d 893, 908 (7th Cir.1986). The question of whether immunity attaches is one of law for the court to decide. *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988); *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). The issue is thus, whether Sandy Tryon acted in an objectively reasonable manner when she initiated the proceedings which ended with the children being removed from their family without a predeprivation hearing.

█ Hildegarde Navis has submitted her own affidavit detailing what she would have told Sandy Tryon had she been consulted before the removal. Resolving all inferences in favor of her, it appears that she had no knowledge of the fact that her husband had been sexually abusing the daughters until informed of that fact by Sandy Tryon. She loved her children and was only away from them because of the necessity of maintaining full and part-time employment. She admits that prior to 1974, when she took a series of parenting classes, she had employed corporal punishment, including striking the children with a leather strap. She ceased that activity after the classes. She always arranged to have an adult sibling present when she had to be away from home and the children were at home. For some reason it appears that a rift developed between Hildegarde and her daughters Carolyn, Faith and Debbie. This would apparently explain the statements which they made to Tryon concerning the mother's alleged neglect.

Hildegarde Navis clearly blames Sandra Tryon, Catherine Pipping and Cindy Champeau for the length of the separation between her and her three youngest children. She complains that they didn't listen to her and refused to cooperate in her efforts at reunification. She admits that her first three lawyers listened to her but continually advised her not to fight the system but to cooperate with the Department of Social Services, that being the fastest route to the return of her children. It wasn't until her fourth attorney was able to persuade Judge Weinke to order the counseling of the mother and the three children to be switched to the Dodge County Department of Social Services that reunification was quickly accomplished.

The nineteen-page, single-spaced report to the court by Sionag M. Black, Ph.D., J.D., the psychologist who counseled both Dawn and Mrs. Navis, indicates that Mrs. Navis was not always treated with the utmost fairness. However, in noting that she had "some very negative things to say

about the agencies in Fond du Lac ... it is easy to criticize from the point of hindsight." She adds that she was "not in this report trying to imply bad faith, but more overzealousness and at times a lack of professionalism."

In a lengthy letter of December 3, 1987, to Family Court Commissioner Fowler, guardian ad litem Anthony Sanfelippo recommended that the custody of the three children be vested in their mother. He notes as follows:

> During this period of time, that being December 7, 1984, to the present, this family has been more extensively counselled [sic] and evaluated than any in my memory. By my count there have been at least 14 counselors involved with this family in one fashion or another. In that respect, this case represents one of the most complicated matters of this nature in which I have ever been involved. This complication has been exacerbated by the dynamics of this family. Simply stated Mr. and Mrs. Navis and their eleven children are in my estimation, a family in name only. For an extensive period of time even well beyond December of 1984 this family has been at war both within and without itself. Testimony has revealed that, of all the children of this family, only Beth, Dawn, a couple of the older boys, and to a marginal extent, Peter and Tim, wish to have anything at all to do with their mother. It is quite evident that the daughters Carolyn, Debra, and Faith are invested what can only be called a hostile relationship with their mother. The feelings, emotions, and attitudes within this family have become so hostile over the years that I believe it would take a direct act of God to bring this entire family to any semblance of unanimity.

He provided the caveat that in his opinion the mother "does exhibit some significant deficit which may limit her ability to parent these children in the most optimal fashion." He continued, however, to opine that some of these deficits might actually have been exacerbated by the social workers involved. "In the 15½ years that I have practiced law

I have never seen a case so horribly mismanaged as this...."

Despite the sad and telling observations by caring professionals, it is this court's function to determine whether a genuine issue of material fact exists as to whether these plaintiffs were deprived of their constitutional rights. The Constitution guarantees that government entities will not deprive citizens of their liberty interest in familial relationships without due process of law. To reiterate some uncontested facts, it must be noted that this matter came to the attention of the Fond du Lac Department of Social Services when a 17–year old girl reported that she was being sexually molested by her father.

Tryon immediately commenced an investigation by speaking with Faith who complained not only of her father's sexual abuse, but also her mother's neglect. Within two days Tryon had meetings with the other three minor children. Within a week, the adult Navis children had been interviewed which interviews supported the allegations of abuse and neglect.

Wisconsin law does not require that parents be notified prior to the taking of children into custody. Wis.Stat. § 48.19(2) provides as follows:

> When a child is taken into physical custody as provided in this section, the person taking the child into custody shall immediately attempt to notify the parent, guardian and legal custodian of the child by the most practical means. The person taking the child into custody shall continue such attempt until the parent, guardian and legal custodian of the child are notified, or the child is delivered to an intake worker under s. 48.20(3), whichever occurs first. If the child is delivered to the intake worker before the parent, guardian and legal custodian are notified, the intake worker, or another person at his or her direction, shall continue the attempt to notify until the parent, guardian and legal custodian of the child are notified.

Similarly, Wis.Stat. § 48.20(8) provides:

> The intake worker shall base his or her decision to hold a child in custody on the criteria specified in s. 48.205 and criteria

promulgated under s. 48.06(1) or (2). If a child is held in custody, the intake worker shall notify the child's parent, guardian and legal custodian of the reasons for holding the child in custody and of the child's whereabouts unless there is reason to believe that notice would present imminent danger to the child. The parent, guardian and legal custodian shall also be notified of the time and place of the detention hearing required under s. 48.21, the nature and possible consequences of that hearing, the right to counsel under s. 48.23, regardless of ability to pay, and the right to present and cross-examine witnesses at the hearing. If the parent, guardian or legal custodian is not immediately available, the intake worker or another person designated by the court shall provide notice as soon as possible. Where the child is possibly involved in a delinquent act, and where the child is alleged to be in need of protection or services and is 12 years of age or older, the child shall receive the same notice about the detention hearing as the parent, guardian or legal custodian. The intake worker shall notify both the child and the child's parent, guardian or legal custodian.

There is no controversy that Hildegarde Navis was notified twice on the day the children were taken into custody, once at work and once later at home. The children were taken into custody on a Friday and the detention hearing occurred the following Monday morning. Although she was not represented at the initial detention hearing, she was present and did not protest when Tryon represented that she was in agreement with the initial plans for the children. From that time forward she appeared to be consistently represented by counsel and this court will not permit her to collaterally attack the various state judgments involved in the CHIPS proceedings. The court must find that Tryon acted in an objectively reasonable manner and the plaintiffs have failed to show that there is any issue of fact requiring a trial. *See generally Doe v. Hennepin County*, 858 F.2d 1325 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989).

Just as there has been no evidence that the plaintiffs were improperly deprived of a constitutionally guaranteed right, neither has there been any evidence of a conspiracy. As with the claims against the individual defendants, once this matter was before the court which was almost immediately, the defendants could only act pursuant to court orders. The plaintiff's dissatisfaction, if any, could have been aired at the proper time or appealed. In short, the court finds that the plaintiff has not stated a federal cause of action. This being the case, it is of course appropriate for the court to relinquish jurisdiction of the remaining pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Accordingly, IT IS ORDERED that the defendant's motion for summary judgment be and hereby is GRANTED.

The Clerk of Court is directed to enter judgment in favor of the defendants and against the plaintiffs with prejudice and with costs.

Done and Ordered.