**Glen Dale SIMKUNAS, Plaintiff,**

v.

**Michael TARDI, Robert Troy, Al Vodicka, Charles Forsythe, Peter Hurst, individually and as Officers of the Hickory Hills Police Department, and The City of Hickory Hills, Defendants.**

No. 87 C 7752.

United States District Court, N.D. Illinois, E.D.

Aug. 31, 1989.

Patrick A. Tuite, John L. Hines, Jr., Tuite, Mejia & Giacchetti, Chicago, Ill., for plaintiff.

William S. Wigoda, Peter A. Nicholson, Horvath & Wigoda, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

MAROVITZ, Senior District Judge.

This case concerns the savage rape and murder of a young woman, and the subsequent police investigation of that brutal crime. In the four decades of experience on the bench, this court cannot recall a case that was such a conglomeration of bizarre facts and circumstances. On December 20, 1982, Susan Marie Schaaf (hereinafter, "Schaaf") was raped and murdered in her Hickory Hills, Illinois apartment. That same afternoon, the Hickory Hills Police Department ("HHPD") began its investigation of the rape and murder of Schaaf.

On September 5, 1986, plaintiff Glen Dale Simkunas ("Simkunas") was arrested by officers of the HHPD in connection with the Schaaf case. On September 7, 1986, Simkunas was charged with the rape and murder of Schaaf. He was indicted on these same charges on September 8, 1986. On February 6, 1987, the Cook County State's Attorney moved to dismiss all

charges against Simkunas. The motion was granted and all charges were dismissed.

On September 4, 1987, Simkunas filed the instant lawsuit against the City of Hickory Hills and five officers of the HHPD.

The Complaint alleges that "[a]t all times material hereto, the defendants were aware of plaintiff's innocence of the crimes charged and were in possession of information which exonerated plaintiff." Complaint at 3. Counts I and II of the Complaint are brought under 42 U.S.C. § 1983 and allege violations of Simkunas' civil rights; Count III raises a pendent state claim of false arrest; and Count IV charges a pendent state claim of malicious prosecution. Simkunas seeks $10 million in damages, plus costs and attorney's fees on each count.

The parties have informed this court that they "have completed discovery for purposes of the Motion for Summary Judgment." Letter from John L. Hines, Jr. to Hon. Abraham Lincoln Marovitz (Aug. 15, 1989) (copy to Bill Wigoda); Letter from William S. Wigoda to Hon. Abraham Lincoln Marovitz (Aug. 10, 1989) (copy to John L. Hines and Patrick A. Tuite).

Currently before the court are the motions of the defendants for Summary Judgment. These motions have been fully briefed. This court subsequently ordered the parties to file supplemental briefs on the issue of qualified immunity. The parties have filed with the court such supplemental briefs.

Upon the suggestion and agreement of the parties, this court recently entered an order of summary judgment in favor of all defendants except Hickory Hills Police Officers Michael Tardi and Robert Troy. Accordingly, this opinion concerns only these two officers.

## Discussion
### Summary Judgment

As this is a motion for summary judgment, "[t]he record and all reasonable inferences to be drawn from it are viewed in a light most favorable to the party opposing the motion." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 567 (7th Cir.1989). However, "[i]f the nonmovant bears the burden of proof on an issue ... he or she may not simply rest on the pleadings; rather, the nonmovant must affirmatively set forth specific facts that show that there is a genuine issue of material fact." *Id.* Further, "the 'existence of disputed facts' ... [are] not enough, however, to defeat a motion for summary judgment.... Rather, ... '[t]he disputed facts must also be material to the legal issues in the case.'" *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir.1985).

### Qualified Immunity

Qualified immunity is a doctrine that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity is the best attainable accommodation of competing values. In situations of abuse of office, it is not a complete bar to an action for damages, which may offer the only realistic avenue for vindication of constitutional guarantees, as is absolute immunity. On the other hand, it protects the country from the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Kompare v. Stein*, 801 F.2d 883, 886–887 (7th Cir.1986) (citations omitted). In other words, "Qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

■ The protection of qualified immunity is available to those government officials who perform discretionary functions. In that respect, qualified immunity has probably been most used by police officers in cases challenging police conduct relating to arrest. *Kompare v. Stein*, 801 F.2d at 887.

In the instant case, the defendants pled the affirmative defense of qualified immunity in conjunction with their Answer to the Complaint. Answer at 14.

■ Qualified immunity not only protects government officials from liability, but can also save them from the burdens of trial and discovery. *Rakovich v. Wade,* 850 F.2d 1180, 1204 (7th Cir.) (en banc), *cert. denied,* — U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *Green v. Carlson,* 826 F.2d 647, 651 (7th Cir.1987). For this reason, the use of the qualified immunity doctrine in conjunction with the summary judgment tool should be encouraged. *Rakovich,* 850 F.2d at 1205.

■ "This circuit has recently held that, even though pertinent facts may be in dispute, the question whether [qualified] immunity attaches is always one for the judge to decide." *Hughes v. Meyer,* 880 F.2d at 969 (citations omitted); *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988); *Rakovich,* 850 F.2d at 1201–02. However, while the issue of qualified immunity is a question of law, it cannot be decided in the abstract; the court can only make this determination in reference to the particular facts of the case. *Rakovich,* 850 F.2d at 1202.

■ In order to make this qualified immunity determination, the court looks to how the plaintiff has characterized the defendant's actions in accordance with the facts of the case. The court than compares this characterization to the law at the time that the alleged violation occurred in order to determine if the defendant's actions violated the clearly established law. *Id.* at 1209. The United States Court of Appeals for the Seventh Circuit has set out the following two prong test for this determination: " '(1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question?' " *Id.* at 1210, quoting *Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986). The plaintiff carries the burden of establishing the existence of the "allegedly clearly established constitutional right." *Rakovich,* 850 F.2d at 1209 (citation omitted).

The analysis that the court must undertake is to ask itself whether "it was clearly established that *under the facts of this case* [the police conduct] ... was improper." *Id.* at 1211.

For situations where it is alleged that the police arrested an individual without probable cause, the standard that this court must apply to determine if qualified immunity is available has been phrased several different ways. In *Rakovich* the court stated that qualified immunity is available to a police officer if "a reasonably well-trained police officer could believe that his conduct did not violate a clearly established right. In other words, viewing it in a light most favorable to [plaintiff], officers of 'reasonable competence could disagree,' *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), and 'in the light of the preexisting law the unlawfulness [was not] apparent,' *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)." *Rakovich,* 850 F.2d at 1214.

Further, even in cases where there may not be probable cause to arrest, "if officers of reasonable competence could disagree on whether there was probable cause, the defendant would be immune from damages liability." *Jones,* 856 F.2d at 994 (citation omitted). Put another way, "only if no reasonable police officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited." *Id.*

■ Most recently, in the *Hughes* case, the Seventh Circuit commented, "[w]e apply the 'clearly erroneous' standard of review to the district court's determination that a reasonable police officer in like circumstances [c]ould have acted as the defendants did." *Hughes v. Meyer,* 880 F.2d at 969 (citations omitted). As such, the standard used in determining an officer's reasonable belief as to validity of probable cause is less stringent than the standard used in determining the existence of probable cause. *Id.* at 969–70. Thus, "even in the absence of probable cause for an arrest, qualified immunity provides officers with an additional layer of protection

against civil liability." *Id.* As Judge Coffey has stated, "a distinction exists between the constitutional standards of probable cause and the officer's reasonable belief as to the validity of probable cause." *Moore v. Marketplace Restaurant,* 754 F.2d 1336, 1348 (7th Cir.1985).

■ Further, in deciding this motion for summary judgment regarding qualified immunity, this court must consider *all* of the undisputed evidence in the record. *Green v. Carlson,* 826 F.2d 647, 650 (7th Cir.1987).

The court must also consider this concept of "probable cause." What exactly is it? Or more specifically, when do the police have it? This concept was recently expressed this way:

> Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed. Probable cause is to be determined in a "practical, nontechnical" manner. The inquiry into the existence of probable cause raises questions of "probabilities ... the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Probable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.

*Hughes v. Meyer,* 880 F.2d at 969 (citations omitted); *see also, United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987).

Put more succinctly, "probable cause exists where the facts and circumstances at the time of the arrest and of which the police had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person committed or was committing an offense." *United States v. Patino,* 862 F.2d 128, 132 (7th Cir.1988) (citation omitted).

■ In determining whether a police officer had probable cause to arrest, the court must view each situation in light of the totality of the circumstances. *People v. Henderson,* 36 Ill.App.3d 355, 344 N.E.2d 239, 253 (1976) (citations omitted). In that regard, the court must not limit itself to looking at supposedly "guilty" behavior on the part of the arrestee. The U.S. Supreme Court has noted that "innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens' (sic) demands.... In making a determination of probable cause the relevant inquiry is not whether the particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts." *Illinois v. Gates,* 462 U.S. 213, 243–244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983).

■ Further, in situation such as this one, where police officers have been working together, the court will look to the collective knowledge of all of the police officers involved when considering the issue of probable cause. *U.S. v. Patino,* 862 F.2d at 132 (citation omitted); *People v. Henderson,* 344 N.E.2d at 253.

■ Finally, it has been said that § 1983 is essentially a tort statute. *Button v. Harden,* 814 F.2d 382 (7th Cir.1987). Thus, "[t]o prevail under it a plaintiff must show not only that his federal rights were violated but also that, had it not been for the violation, the injury of which he complains would not have occurred." This essentially establishes a "but for" test for § 1983 cases. In the context of the instant case, this means that Simkunas not only must show that the police acted improperly so as to deny him his civil rights, and not only must show that no reasonable police officer could have mistakenly believed that he had probable cause to arrest, but that "but for" the improper police conduct no reasonable police officer could have mistakenly believed that he had probable cause to arrest. Put another way, if, after this court reviews all the evidence in the record as to that which was known to Officers

Tardi and Troy at the time of Simkunas' arrest, and viewing it all in a light favorable to Simkunas, if this court finds that despite the alleged police misconduct, that a reasonable police officer could still mistakingly believe that he had probable cause to arrest Simkunas, Officers Tardi and Troy are entitled to qualified immunity, and summary judgment must be entered in their favor. *Cf., United States v. Johnston,* 876 F.2d 589, 594 (7th Cir.1989) (Posner, J., concurring) (dealing with search warrants) ("warrant procured on the basis of an affidavit that contains unlawfully obtained information is nevertheless valid if the lawfully obtained information ... is sufficient by itself to establish probable cause.").

### Count I

In Count I of the Complaint, the plaintiff alleges that "the defendants deprived the plaintiff of his right to be free of unreasonable seizures, specifically his right not to be arrested except upon probable cause." Complaint at 7.

Plaintiff's case essentially "revolves around two key witnesses" and "two other important elements." Plaintiff's Consolidated Response To Defendants' Motions For Summary Judgment ("Plaintiff's Response") at 3, 4. Plaintiff contends that it was because of these four instances of alleged police misconduct that Simkunas was arrested, and that without these "elements" the HHPD would not have probable cause to arrest Simkunas.

Specifically, these four elements consist of the following:

1.) *The August 1986 Interviews With Mary McHugh.* Mary McHugh ("McHugh") was Schaaf's next door neighbor. On the morning of Schaaf's death, McHugh saw and spoke to an unknown subject at the common back door between Schaaf's and McHugh's units. This unknown subject is believed to be the offender in this case. The plaintiff contends that on August 13 and 14, 1986, "Detectives Tardi and Troy conducted lengthy interviews of McHugh.... During those interviews, the detectives used intimidating and coercive measures and thereafter manipulated and misrepresented the content of the interview in police reports.... McHugh flatly denies ever making these statements to the detectives and claims that the officers tried to put those words in her mouth." Plaintiff's Response at 3.

2.) *The Wayne Padgett Lineups.* Wayne Padgett was a tree trimmer who was working outside the Schaaf residence at the time of Schaaf's death. He had told police that he had seen the unknown subject that is believed to be the offender in this case. The plaintiff argues that "regarding Wayne Padgett, a lineup was conducted on September 6, 1986, a few weeks after the McHugh interviews, in which Padgett purportedly positively identified Simkunas as the person he saw to go the victim's house (sic) on the day of the murder. Prior to that live lineup but after the McHugh interviews [August 24, 1986], the detectives visited with Padgett in Texas and conducted a photo identification session. When the detectives initially showed Padgett a picture of a lineup of six individuals among whom Simkunas was standing, Padgett initially picked out someone other than Simkunas as the person who he saw come to the victim's house. The Hickory Hills police did not disclose this fact or any of the suggestive procedures ... in any police report or to the state's attorney." Plaintiff's Response at 4.

3.) *The First Anniversary Interrogation.* As part of the investigation of the Schaaf killing, the Federal Bureau of Investigation prepared a psychological profile of the unknown assailant. That profile suggested that the offender may show up at the grave of the victim. The HHPD "staked out" the Schaaf gravesite on the one year anniversary date of the crime. On that day, Simkunas showed up at Schaaf's grave. The police stopped Simkunas and asked him to come back to the police station, where Simkunas was questioned about the Schaaf case. Regarding this questioning, plaintiff contends that he "gave a significant number of details about how the murder occurred. The officers reported this fact [ (his detailed knowledge

of the case)] as tending to indicate guilt. However, ... Simkunas was the victim's sister's boyfriend and ... [as such,] he met with the sister and police officers ... a number of times ... in which the facts of the case were discussed. The detectives did not report ... [these] prior contacts ... and did not report that during the interview ... [Simkunas] told them he was reciting their own version of how the murder occurred." Plaintiff's Response at 5.

4.) *The Physical Evidence.* The plaintiff argues "that there is not a shred of physical evidence implicating Glen [Simkunas] in this crime. Moreover, the hair analysis tends to exclude Glen [Simkunas].... [E]xcept as to one hair found [to be] inconclusive as to Glen, all hairs recovered were expressly found to be dissimilar." Plaintiff's Response at 5.

The court will address each of these points separately.

*The August 1986 Interviews With Mary McHugh.*

█ Mary McHugh is a very interesting witness. She apparently admits to having a rather selective memory. *See, e.g.,* McHugh Deposition Transcript, Feb. 8, 1989 at 189, 236. She also is admittedly fearful of the killer and has been afraid to get involved in the investigation of the Schaaf case. *See, e.g.,* McHugh Deposition Transcript, Feb. 1, 1989 at 107, 132.

While McHugh now denies that she ever told the HHPD that she could identify Simkunas as the suspected unknown suspect, she merely does not now recall if she ever told any Assistant State's Attorneys that she could identify Simkunas. However, the Assistant State's Attorneys all seem to remember that McHugh said that she could make the identification. Simmons Deposition Transcript, Dec. 28, 1988 at 40 ("Specifically, I don't know what she [McHugh] said, but generally, I do remember that she said yes, it was him [Simkunas].") ; Davy Deposition Transcript, Sept. 9, 1988 at 112 ("Basically I asked Mary McHugh to tell me what she had seen on the day of the murder, and.... [s]he stated she saw Glen Simkunas."); Walsh Deposition Transcript, Sept. 7, 1988 at 26 ("[S]he [McHugh] said

that she had seen Simkunas at the front door of ... the person who was murdered ... the day that the woman was found dead.").

It has been the experience of this court, with over 40 years on the bench of both the federal and state courts, and the many years before that as a trial attorney and as a prosecutor, that it is neither a unique nor uncommon occurrence for a identifying witness, for whatever reason, to change his or her mind about a identification that was previously made.

However, despite the low level of credibility that this court would normally give to McHugh's testimony and affidavit due to her apparent contradictions and her unreliable memory, *e.g., compare,* McHugh Deposition Transcript, Feb. 1, 1989 at 128–31 *with,* McHugh Deposition Transcript, Feb. 8, 1989 at 217–18, this court must, at this summary judgment stage, assume all questions of fact in the nonmovant's favor. Accordingly, this court must conclude that the August 1986 identification made by McHugh was either fabricated or coerced. This assumption, however, does not exonerate Simkunas. In fact, the court is left with the undisputed fact that in December 1983, McHugh "stated that Glen Simkunas closely resembled the ... [unknown subject] that she saw on the day of [Schaaf's death]." Plaintiff's Response at 15.

*The Wayne Padgett Lineups.*

█ Plaintiff claims that the August 24, 1986 photo line-up shown to Wayne Padgett was suggestive. Plaintiff further contends that any subsequent identifications, including the September 6, 1986 live line-up, in which Padgett emphatically identified Simkunas are "irreparably tainted". Plaintiff's Memo. In Opposition To Finding Qualified Immunity For Defendants ("Plaintiff's Supp. Memo.") at 6; *see also, e.g.,* Padgett Deposition Transcript, Jan. 4, 1989 at 85 ("Q. [by defense attorney Nicholson] 'And as you sit here today, are you—is it more than a probability that the person that you saw in the house was Glenn Dale Simkunas.' A. [by Padgett] 'I never saw him in the house. I saw him walk in the house, there is no doubt in my

mind.' Q. 'That it was Glen Dale Simkunas?' A. 'Yes. The day I saw him in that lineup is that [sic] the day that I knew that was him. I saw my guy.' ").

Unfortunately, plaintiff cites no cases for his contention that a possibly suggestive identification cannot contribute to a finding of probable cause. Clearly the law recognizes situations where a witness's identification can be admissible despite a previous suggestive identification. *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir.1988) ("[A]n identification engendered by a suggestive and unnecessary procedure may still be admitted if it is adequately reliable—based on the witness'[s] mental imprint of the accused formed at the time of the crime, and unaffected by any observations, promptings or suggestions at the legally impermissible confrontation...."); *Walton v. Lane*, 852 F.2d 268, 271 (7th Cir.1988) ("Even though ... identification procedures are suggestive, however, the central question [is] whether under the "totality of the circumstances" the identification was reliable...."); *Morgan v. South Bend Community School Corp.*, 797 F.2d 471 (7th Cir.1986) ("[F]actors ... to determine when an in-court identification may be admitted despite a suggestive pre-trial identification.... are: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.")

However, even assuming, as the court must on a motion for summary judgment, that the photo identification by Padgett on August 24, 1986 was tainted, this fact does not exonerate Simkunas from being a suspect. Furthermore, the in-person lineup in which Padgett identified Simkunas took place on September 7, 1986, after the HHPD had arrested Simkunas. Accordingly, any defects with this lineup is irrelevant to the question of whether the police had probable cause to arrest Simkunas on September 5, 1986.

*The First Anniversary Interrogation.*

The F.B.I. psychological profile indicated that the unknown offender may show up at the victim's grave. The HHPD had the Schaaf grave under surveillance on the one year anniversary of the crime. The plaintiff was spotted by the police visiting the Schaaf grave, and brought him into the station for questioning. The HHPD felt that the details that Simkunas knew of the crime tended to indicate guilt. The police also felt that Simkunas knew details about the crime that, the police believed, no one other than the police and the offender would have known.

The plaintiff disputes the significance of his presence at the Schaff grave on the one year anniversary, and the details of the crime as he told the police on that day. Simkunas states that due to his relationship with the victim's sister, he had spoken with the victim's family and the police on several occasions about the crime. As such, plaintiff contends, he was privy to the details of the offense, and any descriptions of the crime that he told to the HHPD were merely recapitulations of what the police and the family of the victim had told him on previous occasions. Simkunas even states that he knew that the HHPD were going to stake-out the gravesite when he paid his visit there.

As this is a motion for summary judgment, this court must assume all disputed facts in the plaintiff's favor. As applied to this situation, the court must accept the plaintiff's story that he knew that the police were staking-out the gravesite on the anniversary date and went there to pray and pay his respects, and that all of the details of the crime that he told the HHPD on that day were based on details that had been previously told to him by the police and by the victim's family.

*The Physical Evidence.*

 Plaintiff states that "there is not a shred of physical evidence implicating ... [him] in this crime." Plaintiff's Response at 5. Plaintiff concentrates on the laboratory report regarding the hair analysis. Specifically, the laboratory report on Simkunas's hair samples did not find Simku-

nas's hair samples consistent with hairs found at the crime scene. The plaintiff is correct insofar as this report does not tend to implicate him as the offender. However, it must be kept in mind that while the report does not tend to implicate Simkunas, neither does it completely exonerate him.

■ Further, while this court is certain that every suspect in a criminal investigation would appreciate the police conducting the investigation with the aim of vindicating the suspect, this is surely not what the police are required to do. As the Seventh Circuit recently stated, "[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989).

### The Other Evidence.

Consistent with the outline of the analysis that this court must go through in conjunction with a summary judgment motion regarding qualified immunity, as stated above, the court considered all of the undisputed evidence in the record, read in the light most favorable to the nonmovant. *Green v. Carlson*, 826 F.2d at 650. Accordingly, this court performed an extensive and intensive review of the thousands of pages of deposition transcripts, exhibits, affidavits and other evidence that both parties (although, for the most part, from the plaintiff) placed in the record.

■ By agreement of the parties, the court reviewed the DNA testing that was conducted by Lifecodes Corporation. However, DNA testing is a very new technology. *See generally*, Burk, *DNA Fingerprinting: Possibilities and Pitfalls of a New Technology*, 28 Jurimetrics J. 455 (1988); Williams, *DNA Fingerprinting: A Revolutionary Technique in Forensic Science and Its Probable Effects on Criminal Evidentiary Law*, 37 Drake L.R. 1 (1988); Comment, *DNA Identification Tests and The Courts*, 63 Wash.L.Rev. 903 (1988); Haller, *Can DNA Save Dotson?*, Chicago Law., Feb. 1988, at 1; *Nightline:*

*DNA Fingerprinting* (ABC television broadcast, Aug. 15, 1989) (transcript available from Journal Graphics, Inc., 267 Broadway, New York, New York 10007). It is such a new technology that the first conviction using DNA "fingerprinting" occurred only two years ago in Britain, where the technique was first developed. Williams, *supra*, at 4 (1988); *Nightline: DNA Fingerprinting, supra*, transcript at 1. The first American conviction using DNA "fingerprinting" took place only last year in a Florida state court. Williams, *supra* at 10 n. 65 (1988); *Nightline: DNA Fingerprinting, supra*, transcript at 1. In this case, the samples used to perform the testing were not sent to Lifecodes until March 2, 1988, and the report was not prepared by Lifecodes until February 1, 1989. The parties agree, and this court concurs, that since the DNA testing did not occur until long after Simkunas was arrested, jailed, and released with the charges against him dropped, the DNA testing has no relevance to the motion for summary judgment before the court today.

From the extensive review of the record, the court found considerable other evidence that the HHPD had in their possession about Simkunas when they arrested him on September 5, 1986. The following is an extensive, although not exhaustive, listing of some of evidence that the court has isolated and chooses to articulate in this opinion.

° Based on eyewitnesses' statements, the unknown subject was a white male who had some facial hair, possibly a mustache. Plaintiff is a white male and had a mustache at the time.

° Based on eyewitnesses' statements, the FBI psychological profile, and physical evidence, the offender was a male who was known by the victim. Simkunas is a male who was known by the victim.

° Eyewitnesses state that the suspected unknown subject wore a blue parka-style jacket. Others told police that Simkunas owned a blue parka-style jacket, and was seen wearing it within a day of the crime.

° The FBI psychological profile indicated that the offender was probably age 25–32, lived in the same town or a neighboring community, lived with his parents or lived alone in rental property. The plaintiff at the time of the crime was 29 years old, he had lived in the vicinity with his mother, and later moved into an apartment.

° At the time of the murder, Simkunas was a student at a technical school in downtown Chicago. The sign-in sheet for the day of the crime shows that Simkunas signed in at 8:30 a.m. and signed out at 1:30 p.m. The crime took place at approximately 11:30 a.m. Interviews with the class instructor and classmates indicated that due to a "lab" or a test, Simkunas probably left class at about 10:00 or 10:30 a.m.

° A barber in the nearby suburb of Oak Lawn reported that Simkunas had his hair cut at about 1:00 p.m. on the day of the crime.

° The police were informed that Simkunas would remove the cord from his telephone handset in order to avoid incoming phone calls. Physical evidence at the crime scene indicated that the offender had removed the victim's telephone and had taken it with him.

° Laboratory reports on blood and saliva samples from Simkunas stated that Simkunas "cannot be eliminated as a possible source of the seminal material located on the evidence."

° The police had been informed that Simkunas was "a drinker" and had used marijuana. The police had also been informed that when intoxicated, Simkunas had the potential for extreme violence. A sergeant with a nearby community's police department informed the Hickory Hills Police that Simkunas was a neighbor of his and that on one occasion Simkunas threw his girlfriend down a flight of stairs. Simkunas previously had been arrested for a traffic incident in which he supposedly rammed a car driven by a woman with his car.

° The technical school that Simkunas attended gave each of its students a lab kit that contained wires. At the time of the arrest, the police felt that these wires were similar to the wires used to tie up the victim. (The HHPD police report regarding the finding by Dr. H. Kirschner of the Cook County Medical Examiner's Office, and who performed the autopsy on Schaaf, that the lab kit wires "made similar ligature marks consistent with the ligature marks found on the wrists of Susan M. Schaaf" was specifically *not* considered by the court in determining whether the defendants in this case are entitled to qualified immunity with regard to the plaintiff's arrest. The record indicates that Dr. Kirschner did not report his findings to the HHPD until eleven days after Simkunas was arrested.)

° After being fingerprinted at the Hickory Hills Police station on December 20, 1983, plaintiff washed his hands and meticulously cleaned the sink. Physical evidence at the crime scene indicates that the offender, after killing the victim, washed his hands at the crime scene, and then cleaned up the sink.

° Simkunas told police that he had loved the victim in "a special way." Several persons had told the police that before Schaaf was killed, that they had witnessed or heard of occasions where the plaintiff had made "passes" at Schaaf. The police had also been informed that before her death, Schaaf had stated that she felt uncomfortable around the plaintiff. (Statements made by Simkunas's "best friend", Steven Kochenburg, about Simkunas's strange behavior and that Kochenburg was "positive" that Simkunas murdered Schaaf, were specifically *not* considered by the court in determining whether the defendants in this case are entitled to qualified immunity with regard to the plaintiff's arrest. The record indicates that Kochenburg did not contact the HHPD until September 11, 1986, six days after Simkunas was arrested.)

*Conclusion.*

█ After reviewing all of the undisputed evidence in the record as to that which was known to Tardi and Troy at the time of Simkunas' arrest, viewed in the light most favorable to Simkunas, and con-

sidering the standards for what constitutes probable cause, this court finds that, as a matter of law, that despite making all assumptions on disputed issues in Simkunas' favor, police officers of reasonable competence could disagree on whether there was probable cause to arrest Simkunas. *Jones*, 856 F.2d at 994.

The record indicates that the HHPD put in much effort and many man-hours in conducting the investigation of the Schaaf homicide, following-up on practically every lead or tip, and interviewing countless individuals who might have been of some benefit to the investigation. The record also indicates that in conducting this investigation, the HHPD did not go off "half-cocked" or were driven by personal motives; rather the record shows that, for the most part, the HHPD conducted a highly professional investigation. In this court's opinion, based on this record, it would be a travesty to hold these officers liable under the law. The law, through the doctrine of qualified immunity, shields these officers from liability.

Accordingly, this court finds that Hickory Hills Police officers Michael Tardi and Robert Troy are to be afforded qualified immunity from liability with regards Count I of this Complaint. Therefore, this court will enter summary judgment in favor of defendants Tardi and Troy, and against plaintiff Simkunas as to Count I of this Complaint.

### Count II

Count II of the plaintiff's Complaint alleges that the "[d]efendants arrested plaintiff pursuant to a warrant that was obtained based solely on information that defendants knew to be false or would have been known to be false had they not recklessly disregarded the truth and their conduct was such that a reasonably well-trained person would have known that the conduct was illegal." Complaint at 7–8.

Plaintiff further contends that "the defendants deprived the plaintiff of his right to be free of unreasonable seizures as guaranteed by the Fourth Amendment to the Constitution of the United States, as applied to the states by the Fourteenth Amendment to the Constitution of the United States, and protected by 42 U.S.C. Section 1983." Complaint at 8.

Plaintiff's Count II has one, big, obvious flaw: even though a search warrant had been issued regarding Simkunas, there was never an arrest warrant issued for Simkunas. All of the evidence in the record indicates that Simkunas was arrested in public, based on probable cause. No warrant apparently was ever sought. *See, e.g.,* Documentary Exhibits To Plaintiff's Response To Defendants' Motions For Summary Judgment, Exhibit A, Vodicka Deposition Exhibits No. 47, 43, 45, and Exhibit G, Walsh Deposition Exhibit No. 5. In fact, plaintiff apparently concedes the fact that his arrest was not made pursuant to a warrant. Plaintiff's Response at 36 ("Tom Davy advised the detectives ... to proceed with a *warrantless* arrest on September 5, 1986.") (emphasis added).

Clearly, the existence of an arrest warrant is a necessary element of a charge of obtaining an arrest warrant on false information. On a motion for summary judgment, the nonmovant must not simply rest on the pleading, but must set forth specific facts that show that there is a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). It is apparent to this court that there is no genuine issue that an arrest warrant was ever sought, issued or used in connection with the arrest of which plaintiff complains.

Furthermore, in summary judgment situations where qualified immunity is at issue, the burden is on the plaintiff to establish the existence of the allegedly "clearly established constitutional right." *Rakovich*, 850 F.2d at 1209. Suffice it to say that the court finds that the plaintiff has failed to carry this burden of clearly establishing this rather unique constitutional right that the plaintiff alleges.

Accordingly, the court must enter summary judgment in favor of defendants Tar-

di and Troy, and against the plaintiff Simkunas as to Count II of this Complaint.

### Counts III and IV

 Having stated that summary judgment in favor of defendants Tardi and Troy must be entered, the court now turns to Counts III and IV, the pendent state claims for, respectively, false arrest and malicious prosecution.

In this circuit, it has been held in a § 1983 case with pendent state claims that " '[i]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.' " *Bieneman v. City of Chicago,* 864 F.2d 463, 470 (7th Cir.1988), *quoting, United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *also see, Hughes v. Meyer,* 880 F.2d at 972; *Alm v. Moreth,* 694 F.Supp. 1322, 1325 (N.D.Ill. 1988).

This court notes, however, that the United States Court of Appeals for the Third Circuit used a different tack when it was recently confronted with a situation similar to that which is before this court today. In *Capone v. Marinelli,* the Third Circuit held that where police officers are found to be protected by qualified immunity with regards to § 1983 claims, this qualified immunity also protects the officers from pendent state tort claims arising under the common law. *Capone v. Marinelli,* 868 F.2d 102, 105–106 & n. 6 (3rd Cir.1989), *citing, Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). The Third Circuit in *Capone* remanded the case to the district court with instructions to enter summary judgment in favor of the defendants on all counts.

No matter how persuaded this court might be by the reasoning and the efficiency in the Third Circuit's approach in *Capone,* this court is in the Seventh Circuit, and this court will follow the Seventh Circuit's lead. Accordingly, the court dismisses the two pendent state claims, Counts III and IV, for lacking "any independent basis for federal jurisdiction." *Hughes v. Meyer,* 880 F.2d at 972.

### Order

The motion for summary judgment on behalf of defendants Michael Tardi and Robert Troy is granted. Judgment is hereby entered in favor of defendants Michael Tardi and Robert Troy, and against plaintiff Glen Dale Simkunas on Counts I and II of the Complaint. Counts III and IV are dismissed for lack of jurisdiction.