Glenn Dale SIMKUNAS,
Plaintiff–Appellant,

v.

Michael TARDI and Robert Troy,
Defendants–Appellees.

No. 89–3126.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1990.

Decided May 3, 1991.

Patrick A. Tuite, Brent D. Stratton, John L. Hines, Jr., Tuite & Associates, Chicago, Ill., for plaintiff-appellant.

William S. Wigoda, Peter A. Nicholson, Elizabeth J. Lubiniecki, Horvath, Lieber & Quilici, Chicago, Ill., for defendants-appellees.

Before COFFEY and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

Glenn Dale Simkunas brought this civil rights action under 42 U.S.C. § 1983 in which he alleged that his arrest for the 1982 murder and rape of Susan Schaaf was without probable cause in violation of his constitutional rights under the fourth and fourteenth amendments. He also alleged claims of false arrest and malicious prosecution in violation of Illinois law. Named as defendants were the City of Hickory Hills; its police chief, Peter Hurst; and four of its police officers, Michael Tardi, Robert Troy, Al Vodicka and Charles Forsythe. On stipulation of the parties, the district court entered judgment in favor of all defendants save for Officers Tardi and Troy. As to these officers, the district court concluded that they were qualifiedly immune from suit on Simkunas's federal claims and granted their motion for summary judgment. *Simkunas v. Tardi*, 720 F.Supp. 687, 698 (N.D.Ill.1989). After entering judgment on the federal claims, the district court dismissed the pendent state claims for want of jurisdiction. *Id.* at 699. Simkunas appeals from the district court's determination of qualified immunity. We affirm.

## I. STATEMENT OF FACTS

### A. Overview

On December 20, 1982, Susan Schaaf was raped and murdered in her Hickory Hills apartment. That same afternoon, the Hickory Hills Police Department (HHPD) began its investigation of the rape and murder with Police Officers Tardi and Troy in charge of the investigation. On September 5, 1986, almost four years after the investigation began, the HHPD arrested Simkunas for the crime.

Simkunas knew Schaaf because he was the boyfriend of her sister, Karen Spallina. He became a suspect after he visited Schaaf's grave site on the one-year anniversary of her death. His arrest nearly three years later followed the HHPD's final interviews with Mary McHugh, Schaaf's next door neighbor and co-worker, and with Wayne Padgett, a tree trimmer who was working in front of Schaaf's duplex on the day of the murder.

The HHPD charged Simkunas on September 7, 1986, the Cook County State's Attorney's Office filed an indictment several days later, and Simkunas remained in the Cook County jail until bond was set a month later on October 8, 1986. The Cook County State's Attorney's Office dismissed the charges against Simkunas on February 6, 1987.

### B. Chronology

#### 1. *The Initial Interviews with Mary McHugh and Wayne Padgett*

McHugh discovered Schaaf's body upon her return home from work. On the early afternoon of December 20, 1982, McHugh entered Schaaf's apartment and, after seeing her body, called the fire department and requested an ambulance. The fire department radioed the police who went to the scene and interviewed McHugh shortly thereafter. According to initial reports, McHugh stated that on December 20, 1982, at approximately 11:20 a.m., a white man wearing a blue parka jacket with the hood pulled around his neck came to her back door and asked McHugh if Sue was there. McHugh replied that Sue lived across the hall. She saw the man proceed northbound along the back of the duplex.

The day after the murder the police interviewed Wayne Padgett who stated that on December 20, 1982, at approximately 11:15 a.m., he and his partner were trimming trees in front of Schaaf's duplex when he observed a man with facial hair wearing a blue parka jacket and snorkel

hood walk around from the south end of the duplex, knock on Schaaf's door and speak with Schaaf briefly.

## 2. *The First Year Anniversary Interview*

On December 20, 1983, the one-year anniversary of the murder, the HHPD conducted a stakeout of Schaaf's grave. The idea for the stakeout came from an FBI profile which suggested that the murderer might visit the grave site. Early that afternoon Simkunas showed up at the cemetery. After observing him for some time, the police officers approached him and asked him a few questions. On the basis of his responses, the officers decided to ask Simkunas to come to the police station for further questioning. Simkunas agreed and arrived somewhere around 5 p.m.

While at the HHPD several officers questioned Simkunas during which time Simkunas gave police a detailed account of how he thought the murder occurred. This account corresponded to information in the possession of the police. According to Simkunas, his relationship with Schaaf's sister, Karen Spallina, brought him close to the investigation, and as a result, he was able to give the police their own version of what happened.

After the interview the officers completed their reports. The reports failed to mention that Simkunas had on a previous occasion discussed the case with the officers as well as Schaaf's sister, and that Simkunas advised the officers that his account of the murder was derived from information they had given him. Neither did it state that Simkunas told police that he went to the cemetery to pay his respects, nor that he knew from Schaaf's sister that the police intended to conduct a stakeout.

After the completion of the interview, the officers conducted a line-up with Simkunas participating. During the line-up Mary McHugh identified Simkunas as someone who "closely resembled" the man she saw on the day of the murder. Shortly thereafter Simkunas was fingerprinted and escorted to the washroom to clean the ink off his hands. In the washroom the officers observed Simkunas thoroughly wash his hands and clean the sink. This behavior struck them as somewhat suspicious in that physical evidence at the crime scene indicated that the offender did the same thing after killing Schaaf.

## 3. *The Physical Evidence*

In early January 1984, the police took blood, saliva and hair samples from Simkunas. While Simkunas's hair samples were inconsistent with those found at the scene, his blood and saliva samples did not eliminate him as a suspect.

## 4. *The August 1986 Interviews with Mary McHugh*

On August 13 and 14, 1986, Officers Tardi and Troy met with McHugh at the police station and reinterviewed her as to her observations on the day of the murder. According to the officers, McHugh stated that Simkunas came to Schaaf's apartment on the day of the murder; that she observed a physical struggle between Schaaf and Simkunas through a hallway window; and that she withheld this information from the HHPD because she was afraid. McHugh subsequently denied ever making these statements or identifying Simkunas as the offender during her interviews with the officers.

Several days later Officer Tardi brought McHugh to the Cook County State's Attorney's Office to meet with the two assistants handling the case. According to one of these assistants, Tom Davy, McHugh told him that "she saw Glen Simkunas, who she had known from before, in the door, and he asked for Susan, she stayed around for a while ... she heard something from there which made her fearful; she left." When Davy asked McHugh why she had not told the police this before, McHugh responded that "she was fearful of Glen Simkunas."

## 5. *The August 1986 Photo Lineup with Wayne Padgett*

On August 24, 1986, Officers Tardi and Troy flew to Texas to meet with Padgett who had relocated there. During their meeting the officers told Padgett that they

had a suspect and showed him a photograph of the December 20, 1983 lineup of Simkunas and the other five men viewed by McHugh. Padgett initially selected someone other than Simkunas. On a second try Padgett selected Simkunas.

Upon his return to Chicago Officer Tardi completed a police report concerning his interview with Padgett. In the report he made no mention of Padgett's first, false identification. Officer Tardi conveyed the substance of his report to Assistant State's Attorney Davy who requested that Officer Tardi reinvestigate Simkunas's alibi for the morning of the murder.

### 6. *Simkunas's Alibi*

Simkunas previously told police that on December 20, 1982, he attended an electronics class at a technical school in downtown Chicago from 8:30 a.m. until 1:30 p.m. Simkunas viewed the instructor's attendance sheet for that class and thereafter advised the police that it indicated he and almost all the other students signed out at 1:30 p.m. on the day of the murder. Since the murder took place sometime between 11:30 a.m. and 2:00 p.m., Simkunas claimed that he could not have committed it.

Officers Tardi and Troy checked out Simkunas's alibi with interviews of his instructor and classmates. Through these interviews the officers learned that the instructor did not take attendance in class but used a sign-in sheet instead; that all the students had to sign-in at 8:30 a.m., but were free to leave after the lecture portion of the class, which was approximately two hours long; that following the lecture portion, at around 10:30 a.m., the students took a break and then returned afterwards for lab work; and that many students left class at 10:30 a.m. and completed their lab work at home. The officers learned further that the day after the murder, Simkunas came to class visibly upset and asked his instructor to excuse him from class. Although Simkunas was, in fact, excused from class on the day after the murder, the sign-in sheet for that day reflected that Simkunas was present from 8:30 a.m. until 1:30 p.m.

The officers also conducted an interview of Simkunas's barber in Oak Lawn, Illinois. The barber stated that on December 20, 1982, the day of the murder, Simkunas had an appointment for a haircut at 1:00 p.m. and arrived at his shop shortly thereafter. This statement conflicted with the attendance sheet from Simkunas's class showing that on the day of the murder Simkunas remained in class until 1:30 p.m.

On the basis of their interviews the officers concluded that Simkunas left class at approximately 10:30 a.m. on the day of the murder, and did not have an alibi for his whereabouts between 11:00 a.m. and 1:00 p.m. that day.

### 7. *Simkunas's Arrest*

Once Assistant State's Attorney Davy obtained the results of the officers' investigation of Simkunas's alibi, he authorized the HHPD to proceed with the warrantless arrest of Simkunas on September 5, 1986. Two days later, on September 7, 1986, the HHPD conducted a lineup viewed by Padgett. Present at the lineup were Officers Tardi and Troy, Chief Hurst, Deborah Dooling, the felony review assistant state's attorney, and Simkunas's attorney. As soon as the lineup began, Padgett identified Simkunas. When Assistant State's Attorney Davy learned of Padgett's identification, he authorized the filing of felony charges of murder and rape against Simkunas.

### 8. *The Dismissal of the Charges*

On December 18, 1986, the assistant state's attorneys assigned to prepare the Simkunas case for trial set up a meeting with McHugh. The purpose of the meeting was to review her testimony for trial. At the meeting McHugh recanted her August 1986 interviews with Officers Tardi and Troy and stated that she was not sure what or who she saw on the morning of the murder, that she was no longer able to identify Simkunas, and that she never did identify him during her August 1986 interviews. However, the assistant state's attorneys all remembered that, following these interviews, in August 1986, McHugh

had positively identified Simkunas at Assistant State's Attorney Davy's office. Nevertheless, in light of McHugh's recantation, the Cook County State's Attorney's Office officially dismissed the charges against Simkunas on February 6, 1987. This § 1983 action followed.

## II.  ISSUES FOR REVIEW

On appeal Simkunas contends that the district court erred in concluding that Officers Tardi and Troy had qualified immunity from damages liability under § 1983. Simkunas further contends that in view of this error, the dismissal of his pendent state claims for false arrest and malicious prosecution was improper.

## III.  ANALYSIS

### A.  *Qualified Immunity*

Police officers are entitled to qualified immunity "if officers of reasonable competence could disagree" on whether there was probable cause to make an arrest. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Probable cause for an arrest exists if, at the time the arrest was made, the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person to believe that an offense was committed. *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.1989) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)), *cert. denied*, — U.S. ——, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). The standard for determining probable cause is less stringent in the context of a qualified immunity defense than in the context of a suppression hearing. *See Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1347–48 & n. 14–15 (7th Cir.1985).

The question whether qualified immunity attaches to the police officers' actions is always one for the judge to decide. *Rakovich v. Wade*, 850 F.2d 1180, 1201–02 (7th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). It requires a legal determination by the district court, *id.* at 1204, and, as such, is subject to *de novo* review on appeal, *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir.1989).

Viewing all the evidence in the light most favorable to Simkunas, as we must on summary judgment, *see Green v. Carlson*, 826 F.2d 647, 650 (7th Cir.1987), we conclude that reasonable police officers could have believed that they had probable cause to arrest and charge Simkunas. The evidence in their possession that established probable cause included the following: (1) McHugh identified Simkunas in December 1983 at a lineup as a man who "closely resembled" the suspected perpetrator of the murder; (2) McHugh stated to Assistant State's Attorney Davy in August 1986 that she saw Simkunas—a statement that she never denied having made to him; (3) after being fingerprinted at the police station, the police observed Simkunas thoroughly wash his hands and rinse the sink, in a manner similar to what the police believed Simkunas did after killing Schaaf; (4) Simkunas matched the physical description of the offender given by McHugh and Padgett in that he was a white male who had facial hair; (5) Simkunas fit the FBI psychological profile of the offender in that he knew the victim and appeared at her grave site on the one-year anniversary of her death; (6) Simkunas owned and wore a blue parka-style jacket similar to the one eyewitnesses stated was worn by the offender; (7) on the day of the murder Simkunas signed in for class at 8:30 a.m. and probably left at around 10:30 a.m., leaving him without an alibi for his whereabouts at 11:30 a.m., around the time when the murder occurred; (8) Simkunas's alibi that he was in class in Chicago until 1:30 p.m. conflicted with the statement of his barber from the Chicago suburb of Oak Lawn that he cut Simkunas's hair at around 1:00 p.m.; (9) on the day after the murder Simkunas came to class emotionally upset, asked to be excused, and was, in fact excused; nevertheless, the sign-in sheet for that day listed Simkunas as present in class from 8:30 a.m. until 1:30 p.m.; (10) the laboratory reports on the blood and saliva sam-

ples taken from Simkunas did not rule him out as a suspect; (11) in school Simkunas had access to wires which the police thought were similar to the type of wire used to tie up Schaaf; and, (12) Assistant State's Attorney Davy's judgment that there was sufficient evidence to justify a warrantless arrest of Simkunas.

■ We are of the opinion that this evidence was sufficient for Officers Tardi and Troy to reasonably believe that Simkunas committed the crime, and supplied the requisite probable cause to justify Simkunas's arrest, even in the absence of, what the district court called, the "fabricated or coerced" August 1986 statements of McHugh and the "possibly suggestive" August 1986 identification by Padgett. *See Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir.1990); *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988). While we are cognizant of the fact that the district court did not decide whether the police officers fabricated McHugh's statements or used suggestive techniques in Padgett's identification of Simkunas, Simkunas's argument that the police officers engaged in this behavior in order to create probable cause for his arrest is waived because he raised it for the first time in his reply brief, *see Charles v. Daley*, 846 F.2d 1057, 1059 n. 1 (7th Cir. 1988), and never fully developed it on appeal, *see Hunt v. Jaglowski*, 926 F.2d 689, 690–91 (7th Cir.1991).

Having uncovered sufficient evidence to establish probable cause, Officers Tardi and Troy had "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Schertz*, 875 F.2d at 583. They were entitled to the defense of qualified immunity, and summary judgment on this basis was therefore appropriate.

*B. Pendent Jurisdiction*

■ As the federal claims were properly dismissed before trial, so, too, were the state claims, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), because an

independent basis for federal jurisdiction no longer existed, *Hughes*, 880 F.2d at 972.

### IV. CONCLUSION

For the foregoing reasons, the decision of the district court is

AFFIRMED.