Lois **MILLSPAUGH**, Plaintiff,

v.

**WABASH COUNTY DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

Tina **DYSON**, Plaintiff,

v.

**WABASH COUNTY DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

Nos. S86–53, S86–54.

United States District Court, N.D. Indiana, South Bend Division.

July 31, 1990.

John Johnston, Douglas Lehman, Wabash, Ind., for plaintiffs.

John Lorber, Maggie Mawby Chipman, South Bend, Ind., Gregory R. Lyman, Munster, Ind., for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

Lois Millspaugh and Tina Dyson believe several of their constitutional rights were violated when their county welfare department took their children from them. The defendants they seek to hold liable, child welfare caseworker Manetta Tucker and the Wabash County Department of Public Welfare ("Department"), have moved for summary judgment in separate motions, claiming entitlement to judgment on all of the plaintiffs' claims as a matter of law. Ms. Millspaugh and Ms. Dyson have responded to these motions jointly. Both sides have submitted excerpts from various discovery materials, as well as helpful legal memoranda in support of their positions. The court took the motions under advisement following oral argument on May 10, 1990.

For the reasons that follow, the court concludes that the defendants are entitled to summary judgment.

### I. Facts

The events leading to these causes surround two child in need of services

("CHINS") actions, see IND. CODE 31–6–4–10, involving the plaintiffs' then-minor daughters, Jean and Paula Millspaugh and Vicki and Renee Dyson, initiated by the Department and Ms. Tucker. During 1984, when the CHINS actions were commenced, Ms. Tucker was employed by the Department to investigate, institute, and process CHINS proceedings.

From approximately September or October, 1982 until early 1984, the plaintiffs lived in Wabash, Indiana and the four children attended public school in that county. The Millspaughs and Dysons apparently resided with Ms. Jewell McLaughlin, leader of Faith Ministries, the religious group of which they are members, in a home on Sivey Street. The plaintiffs report that Faith Ministries is incorporated under the laws of the State of Indiana and that the group's religious beliefs include the following: that God will provide all necessities and that His followers will, therefore, take employment upon His direction; belief in prayer for physical healing and administration of medical care only when necessary; placement of little value on worldly possessions except that it is better to give than to receive; and a basic, general belief that all actions should be taken at God's direction. The group engages in religious activities such as fasting, prayer, and homage by lengthy travels.

On February 4, 1984, the plaintiffs left the Sivey Street home with their children, allegedly "stripping" the residence of all possessions and rendering it uninhabitable.[1] The plaintiffs took their families to Kokomo, Indiana, where Rev. Bob Merrill housed them, and then to Indianapolis where they stayed with family of Ms. McLaughlin.

The Department reports first learning that the children were potential subjects of a CHINS petition through an anonymous phone call received on February 2, 1984, indicating that the children "were hun-gry".[2] The Department began an investigation into the plaintiffs' care of their children which uncovered: (1) the condition of the residence; (2) the plaintiffs' membership in the Faith Ministries; (3) the daughters' removal from school without any notice; and (4) the plaintiffs' departure to Kokomo to see a Rev. Bob Merrill. Ms. Tucker worked on the case with Judy Mason. She reports visiting the house on Sivey Street, speaking with school administrators and Rev. Merrill, contacting the local Wabash newspaper, neighbors, and other members of the community to inquire about the care the plaintiffs provided for their children. Rev. Merrill told Ms. Tucker that the plaintiffs arrived in Kokomo with the children with no luggage, money, or plans for accommodations.

On February 8, Ms. Tucker and Department Attorney Steve Downs filed a CHINS petition alleging that the Dyson and Millspaugh children were in need of services and, on that same day, Wabash Circuit Court Judge Lynn Ford issued a detention order to take the children into custody. That evening, the Indianapolis police took the children into custody upon presentation of the detention papers to the plaintiffs. The detention papers contained a notice of the detention hearing on February 10 at 9:00 a.m., but neither plaintiff reports seeing that notice, and the mothers were not given copies of the papers. Neither mother appeared at the February 10 detention hearing in Wabash, at which Judge Ford found that the girls required continued detention until further court proceedings, which he scheduled for March.

When the children first were taken into custody, Ms. Tucker went to Indianapolis with an acquaintance of the plaintiffs, Paul Wildridge, and brought the children back to Wabash. Dr. James McCann, who examined the four children upon their return to Wabash, reports that the children were generally healthy and well. Gerald Gold-

---

1. The defendants explain this "stripping" as the removal of fixtures, appliances, and all furniture from the home, rendering it uninhabitable. The plaintiffs report that these actions were done in preparation for remodeling of the home to be completed in the future.

2. The plaintiffs contend that the Department had been watching them for some time before the call was received. No evidence in the record supports this assertion.

stone, a clinical psychologist, later examined the children and found no emotional or psychological problems other than certain religious views, which he described as unusual, but existent in a minority of the community.

Meanwhile, the plaintiffs left Indianapolis on February 9, travelled to Seymour, Indiana for three days, then to Cleveland, Tennessee, where they stayed until around March 7. Ms. Millspaugh reportedly had a telephone conversation with Ms. Tucker on February 17 in which she informed Ms. Tucker that they were travelling under God's direction and that they could receive messages through a Paul Wildridge. The plaintiffs then went to Ohio, Virginia, Tennessee, North Carolina, Florida, and several suburbs of Washington, D.C.[3] The plaintiffs report several conversations with Mr. Wildridge in which he was unable to give any information concerning the Department's proceedings; the plaintiffs contend that Ms. Tucker failed to contact Mr. Wildridge as requested.[4]

An initial hearing was set in the Millspaugh and Dyson CHINS cases for March 16, and a fact-finding hearing was set for March 23. Notices and summonses were supposedly sent to the plaintiffs through Mr. Wildridge. The plaintiffs, however, report hearing about the court proceedings in early March; they further state that they could not attend because they were on a mission for God and it was not the direction He had given. Lois Millspaugh spoke with Ms. Tucker about the hearing by telephone on March 16.

At the hearing, Judge Ford found that the plaintiffs had actual notice of the hearing and had failed to appear. Charles Millspaugh[5] appeared at the March 16 hearing and denied that his daughters were children in need of services. At Mr. Millspaugh's request, the judge reset the fact-finding hearing in his children's case for April 27. Both plaintiffs contacted Ms. Tucker to find out what had happened at the March 16 hearing; Lois Millspaugh called on March 16 and Tina Dyson on March 19. Ms. Tucker reports telling them the nature of the proceedings, that their absence had been noted, and of the next scheduled proceedings and the need for them to attend. The plaintiffs generally report either no knowledge of subsequent proceedings or insufficient notice.

On March 23, a fact-finding hearing was held in the Dyson children's case; Tina Dyson did not appear.[6] Judge Ford held that Renee and Vicki Dyson were children in need of services, and set a disposition hearing for May 4. On April 27, a fact-finding was held in the Millspaugh children's case; Lois Millspaugh did not appear. Judge Ford took the matter under advisement pending the report of a study of Mr. Millspaugh's home. The record does not suggest that either plaintiff contacted the Department or the county court to find out what had happened at these hearings.

Lois Millspaugh returned from her travels with Jewell McLaughlin[7] on May 17; beginning on May 20, Ms. Millspaugh stayed in Marion, Indiana. She contacted the Department and arranged to meet with her daughters on May 25. Ms. Millspaugh also met with Ms. Tucker on May 25. Ms. Tucker reports telling Ms. Millspaugh that

---

**3.** During their travels through these states, the plaintiffs stayed in a number of places, stopping for periods of time upon God's direction.

**4.** The record reveals that the plaintiffs named Mr. Wildridge as their designated agent for the Department to contact regarding their daughters during the mothers' absence from Wabash. The defendants report sending notices to Mr. Wildridge, while the plaintiffs argue that the notice was never received. The record seems to support both positions. Apparently, notices to Mr. Wildridge were returned unserved.

**5.** Charles Millspaugh is the father of Jean and Paula; he resides in Lincoln, Nebraska. The Millspaughs were divorced and Lois received custody of the two children.

**6.** The father of the Dyson children is Terry Callicoat, whereabouts and marital status unknown. Tina and Terry have an older daughter, Amy, who lives with Tina's parents. Amy supposedly disliked living with her mother and was, therefore, permitted to stay with her grandparents.

**7.** Tina Dyson did not return to Indiana at this time.

she must get a job and have a stable home to get her daughters back and that she showed Ms. Millspaugh the case plan prepared in her daughters' case. Ms. Millspaugh denies seeing the plan. On May 25, Ms. Millspaugh also accompanied Jewell McLaughlin to the office of attorney John Johnston regarding a problem that Ms. McLaughlin was having with her house. Lois Millspaugh did not engage Mr. Johnston's services at that time.

Ms. Millspaugh left the Wabash–Marion area on May 26, stayed in Seymour, Indiana for a few days and then travelled east, living in various parts of Virginia and Washington, D.C. in June. At the same time, Tina Dyson was also travelling in various parts of Virginia and Washington, D.C. The travelling apparently continued until the fall of 1984. In November, a trip abroad was planned, but eventually abandoned. Throughout this time Lois Millspaugh reports certain Divine directions concerning her travels and the care of her children: there was no need to call after the April 27 hearing; she must continue to travel as was God's direction; and her children would be provided for and be returned to her at God's direction.

Both mothers contend that their daughters were always well-fed were kept clean and neat, had clothes to wear, and always had beds to sleep on while in their mothers' care. They state that all children and adults at the Sivey Street house were well-nourished and clean. The plaintiffs further state that the children attended public school in Wabash and received good grades [8] and that their academic success resulted from their religious studies and training. The plaintiffs report their intention of enrolling the children in correspondence school during their religious travels, but concede they had no money for that purpose.[9] The mothers also assert being "watched" by the Department and attack the accuracy of information gathered by the Department concerning their religious practices.

Lois Millspaugh and Tina Dyson first employed John Johnston to represent them to regain custody of their daughters in October, 1984.

On November 29, 1984, the Wabash Circuit Court received a home study on Charles Millspaugh. Dispositional hearings were then scheduled for both the Millspaugh and Dyson cases for December 14 at 11:00 a.m.; notices of these hearings were apparently sent to the mothers by way of a Maryland address. On December 13, Mr. Johnston appeared for the plaintiffs and moved for a change of judge. On December 14, the court set aside its previous determinations and scheduled a detention hearing in both cases for December 17. At that hearing, Judge Ford found that the plaintiffs should have been served with notice by publication, reverted the CHINS proceedings to the initial hearing stage, and granted the motion for change of judge.

On January 2, 1985, Judge Thomas Wright assumed jurisdiction of the cases, and on July 8, 1985, Judge Wright reversed the detention orders previously entered, remanding Paula Millspaugh [10], Vicki and Renee Dyson to their mothers. The Indiana Court of Appeals upheld Judge Wright's ruling on December 17, 1986.

The plaintiffs' travels resumed during the pendency of the new case. Lois Millspaugh travelled between December 31, 1984 and January 6, 1985 to Switzerland with Jewell McLaughlin. On February 12, Lois Millspaugh and Tina Dyson travelled with Ms. McLaughlin abroad, visiting England, France, Switzerland, Italy, Greece, and Jerusalem. Tina Dyson returned to Wabash in May; Lois Millspaugh continued travelling to Tel Aviv, Amsterdam, Athens, Bangkok, Seoul, Honolulu, and Waikiki Beach.

---

**8.** Jean Millspaugh was first in her class in high school, completing her studies in only three years.

**9.** The Dyson and Millspaugh families left Wabash with only the clothes on their back, having given everything else away during the previous week.

**10.** By that time, Jean Millspaugh was 18 years old.

Lois Millspaugh was in Waikiki Beach when she learned from Mr. Johnston that she had won custody of her daughter and would have thirty days to pick her up. Several days later, Ms. Millspaugh left Waikiki Beach and went first to Silver Springs, Maryland, where she stayed several more days before leaving for Wabash on July 19, 1985. She took custody of Paula on July 22, 1985. Paula ran away from her mother eighteen days later and went to Lafayette, Indiana to her former foster parents, Mr. and Mrs. Schrader. Proceedings then began in the Lafayette courts, where the Lafayette Department of Welfare took custody of Paula. The Lafayette court determined that Paula should be returned to her mother.

Vicki Dyson also expressed a desire to return to her foster parents, the Driesens, and not remain with the plaintiffs when they resumed their residence on Sivey Street in Wabash. Ms. Dyson reportedly allowed Vicki to return to the Driesens.

## II. Procedural History

Ms. Millspaugh and Ms. Dyson have brought nearly identical actions alleging that their federal constitutional and statutory rights were violated by the defendants' actions with respect to their daughters. These actions have been consolidated for disposition before this court.

The plaintiffs have asserted a broad range of violations of federal constitutional laws and statutes. They seek relief under 42 U.S.C. §§ 1983, 1985 and 671(a). As the court understands the claims contained in the one-count complaint, the plaintiffs assert two due process claims: first, that the defendants acted illegally in permitting the plaintiffs' daughters' detention based on insufficient, incredible, and unreliable evidence in the preliminary inquiries and affidavits, which evidence did not establish by probable cause that the plaintiffs' children were children in need of services; and second, that they received insufficient notice of the proceedings concerning their daugh-

ters and that no service of process was ever personally received nor was publication made by the defendants.

The plaintiffs contend that the defendants violated the First Amendment in three respects. First, the plaintiffs' rights to exercise their religious beliefs were violated by the alienation of their children from their religion and placement in a different environment. The plaintiffs allege that the defendants violated the Establishment Clause by interfering with their religious beliefs. Finally, the plaintiffs contend that defendants violated their right to association by preventing them from seeing their children. The plaintiffs also allege that the defendants violated the Fourth Amendment by seizing the children illegally, and further claim that the defendants interfered with their fundamental right to raise their families.

The plaintiffs also allege that the defendants violated 42 U.S.C. § 671(a) by failing to develop a written case plan describing the basis for the children's removal.[11]

## III. Standard of Review for Summary Judgment

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir.1990). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990). If he fails to do so, summary judgment is proper. *National Diamond Syndicate, Inc. v. UPS*, 897 F.2d 253, 260 (7th Cir.1990). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Santiago v. Lane*,

---

**11.** The plaintiffs conceded at the hearing on the motion that their earlier claim under 42 U.S.C. § 1981 could not stand.

894 F.2d 218, 221 (7th Cir.1990). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krist v. Eli Lilly and Co.,* 897 F.2d 293, 296 (7th Cir.1990).

The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory allegations in affidavits. *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders v. Heinold Commodities,* 766 F.2d 1007, 1011 (7th Cir.1985). The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989), as long as the inferences are reasonable. *Spring v. Sheboygan Area School District,* 865 F.2d 883, 886 (7th Cir.1989). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir. 1989).

### IV. Ms. Tucker's Motion for Summary Judgment

#### A. Parties' Arguments

Ms. Tucker's grounds for summary judgment travel two basic avenues. She argues that as a CHINS caseworker she is immune from liability under either an absolute or qualified immunity theory and, alternatively, that CHINS caseworkers cannot be held liable for decisions made by other administrators or judicial authorities. She further argues that summary judgment is appropriate in her favor since: (1) the plaintiffs cannot demonstrate causation because their own actions of failing to be present at the hearings (waiving the right to be heard) were the proximate cause of any alleged damages or deprivations; (2) the plaintiffs did not first exhaust state remedies; (3) the plaintiffs can show, at

most, that the defendants were merely negligent in failing to give sufficient notice; and (4) the plaintiffs have no First Amendment religion claim since the government had a legitimate interest in this case.

Ms. Tucker cites numerous cases in which CHINS caseworkers (or similar administrators dealing with child abuse or welfare services, juvenile officers) were found to be absolutely immune from suit as quasi-judicial officers. As Ms. Tucker notes, though, the Seventh Circuit apparently has not ruled on this issue. Ms. Tucker asserts that *Ashbrook v. Hoffman,* 617 F.2d 474 (7th Cir.1980), permits the granting of absolute immunity to similar individuals integrally related with the judicial process.

The plaintiffs refer the court to *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), in which a police officer testifying before a magistrate was granted qualified immunity. Ms. Tucker, however, cites several post-*Malley* cases that continue to grant CHINS caseworkers absolute immunity, distinguishing *Malley.* The plaintiffs principally comment on the lack of probable cause for Ms. Tucker to have proceeded with detention, the negligent or reckless conduct of the investigation, and the various rights of the plaintiffs (and their children) that have been violated. Few of the plaintiffs' comments deal directly with the thrust of the Ms. Tucker's position asserting immunity from prosecution. The defense of immunity presents the strongest basis for summary judgment in Ms. Tucker's favor, and it is on this ground that the court finds such judgment appropriate.

#### B. Applicable Law
##### 1. Nature of Immunity

Some circuits have recognized the absolute immunity of social welfare workers, *Salyer v. Patrick,* 874 F.2d 374 (6th Cir.1989); *Vosburg v. Dept. of Social Services,* 884 F.2d 133 (4th Cir.1989); *Malachowski v. City of Keene,* 787 F.2d 704 (1st Cir.) *cert. denied* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Fanning v. Montgomery County Children & Youth Services,* 702 F.Supp. 1184 (E.D.Pa.1988);

*Donald M. v. Matava,* 668 F.Supp. 703 (D.Mass.1987); *Fogle v. Benton County SCAN,* 665 F.Supp. 729 (W.D.Ark.1987); *Whelehan v. Monroe County,* 558 F.Supp. 1093 (W.D.N.Y.1983), while other courts have given qualified immunity to those administrative and investigative functions of case workers, *Babcock v. Taylor,* 884 F.2d 497 (9th Cir.1989) *cert. denied* — U.S. ——, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990); *J.H.H. v. O'Hara,* 878 F.2d 240 (8th Cir.1989) *cert. denied* — U.S. ——, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990); *Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir.1988); *Austin v. Borel,* 830 F.2d 1356 (3rd Cir. 1987); *Bendiburg v. Dempsey,* 707 F.Supp. 1318 (N.D.Ga.1989); *Snell v. Tunnell,* 698 F.Supp. 1542 (W.D.Okla.1988); *Reynolds by Reynolds v. Strunk,* 688 F.Supp. 950 (S.D.N.Y.1988); *Whitcomb v. Jefferson County Dept. of Social Services,* 685 F.Supp. 745 (D.Colo.1987).

The Seventh Circuit has not definitively determined the type of immunity, if any, to be afforded county social workers engaged in child protective proceedings. The Seventh Circuit generally relies on a functional distinction in determining the type of immunity afforded various governmental officials. In *Henderson v. Lopez,* 790 F.2d 44 (7th Cir.1986), the court explained that a governmental official's quasi-judicial functions executed before or adjacent to court proceedings were given absolute immunity while those investigatory or administrative functions were given only qualified immunity. 790 F.2d at 46; *see also Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Since the tasks of child welfare workers can be quasi-judicial, yet often originate on an administrative or investigative level, the courts of this circuit appear to permit such officials to assert qualified immunity against civil actions. *Landstrom v. Illinois Department of Children & Family Services,* 892 F.2d 670 (7th Cir. 1990) (social worker and school personnel entitled to qualified immunity in suit brought by students and their parents alleging violations of constitutional rights during a child abuse investigation); *Doe v.*

*Bobbitt,* 881 F.2d 510 (7th Cir.1989) *cert. denied* — U.S. ——, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990) (upholding summary judgment in favor of employees of the Illinois Department of Children and Family Services in suit a challenging children's placement in foster care home); *Darryl H. v. Coler,* 801 F.2d 893 (7th Cir.1986) (Illinois Department of Children & Family Services employees entitled to qualified immunity in action by parents alleging illegality of physical exam conducted in investigation of child abuse claim); *Navis v. Fond du Lac County,* 721 F.Supp. 182 (E.D.Wis. 1989) (social worker entitled to qualified immunity in her efforts toward achieving children's removal from natural parents).

Because that circuit has recognized only qualified immunity, and not absolute immunity, for child welfare workers, the court concludes that Ms. Tucker may assert a defense of qualified immunity in these actions. She may be entitled to claim absolute immunity, particularly with respect to conduct relating to the judicial proceedings rather than her investigation, but it is not necessary for this court to become the first within this circuit to so hold. Her qualified immunity, even if she is entitled to no greater immunity, is sufficient to allow her to prevail.

### 2. Qualified Immunity

The defense of qualified immunity only protects a governmental official in certain contexts. Under the doctrine of qualified immunity, public officials performing discretionary functions are protected against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether an official is entitled to qualified immunity, the courts of this circuit consider whether the challenged actions were objectively reasonable in light of the rights of the parties involved, *Alvarado v. Picur,* 859 F.2d 448 (7th Cir.1988); *Simkunas v.*

*Tardi*, 720 F.Supp. 687 (N.D.Ill.1989); *Navis v. Fond du Lac County*, 721 F.Supp. 182 (E.D.Wis.1989); *Woods v. City of Michigan City, Ind.*, 685 F.Supp. 1457 (N.D.Ind. 1988), and whether the allegedly violated rights were "clearly established" at the time of the events in question. *Hedge v. County of Tippecanoe*, 890 F.2d 4 (7th Cir.1989); *Schertz v. Waupaca County*, 875 F.2d 578 (7th Cir.1989); *Doe v. Bobbitt*, 881 F.2d at 511.

▆▆▆ Because analysis of a qualified immunity claim is ostensibly objective, the issue is properly resolved on summary judgment. *Polenz v. Parrott*, 883 F.2d 551 (7th Cir.1989); *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir.1988) (en banc); *Hedge v. County of Tippecanoe*, 890 F.2d at 7; *Schertz v. Waupaca County*, 875 F.2d at 582–583. Although intertwined with a case's facts, the qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d at 450; *Simkunas v. Tardi*, 720 F.Supp. at 690; *Woods v. City of Michigan City, Indiana*, 685 F.Supp. at 1460.

▆▆▆ When confronting a qualified immunity claim, a district court must undertake a two-part analysis: first, whether the alleged conduct set out a constitutional violation; and second, whether the constitutional standards were clearly established at the time of the alleged violation. *Auriemma v. Rice*, 895 F.2d 338, 342 (7th Cir.1990); *Wade v. Hegner*, 804 F.2d 67, 70 (7th Cir. 1986). In addressing the second part of the inquiry, the court must determine whether the rights were clearly established in a particularized sense; the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1986).

▆▆▆ The plaintiffs bear the burden of establishing the existence of the established right, *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987), by pointing to closely analogous cases or other relevant decisional law decided before the conduct at issue. *Doe v. Bobbitt*, 881 F.2d at 511; *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987)

*cert. denied* 484 U.S. 1078, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). The plaintiffs need not point to identical cases, *Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir.1989); *Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir.1985) *cert. denied* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986), or even to binding precedent. *Rakovich v. Wade*, 850 F.2d at 1209–1210. The plaintiffs must, however, come forth with authorities to demonstrate the existence of a sufficient consensus indicating that the challenged conduct was unlawful. *Landstrom v. Illinois Dept. of Children & Family Services*, 892 F.2d at 670. With these standards in mind, the court turns to the cases cited by the plaintiffs. The structure of the plaintiffs' summary judgment argument is such that the court must discuss each of the principal cases the plaintiffs cite in support of their claims. None of those cases, however, set forth a clearly defined constitutional right that Ms. Tucker may be found to have violated.

*Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), addressed the predeprivation procedures afforded to foster families before foster children may be removed from their homes. Although the case contains language, quoted by the plaintiffs, concerning the protections afforded the private realm of family life, 431 U.S. at 842, 97 S.Ct. at 2108, the case's holding addresses none of the alleged wrongdoing by Ms. Tucker. The facts of *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), were closer to the case at bar. *Lassiter* involved the termination of parental rights; the only issue addressed, however, was whether counsel should have been appointed for the indigent parent, an issue not involved here. Similarly, *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), held that parental rights may not be terminated save upon a showing of clear and convincing evidence, but Ms. Tucker is not claimed to have violated that evidentiary standard.

The plaintiffs accurately quote *Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir.

1983), as saying, "Lossman's liberty unquestionably includes the custody that state law gave him of his minor children", but the case's holding affords far less support. The court held that Lossman had demonstrated no damage because his children had been returned to him, and that an adversarial predeprivation hearing is not required when a child's safety is threatened. The court does not understand Ms. Millspaugh or Ms. Dyson to contend that they were entitled to an adversarial hearing before the children were taken.

*Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the only cases the plaintiffs cite in their Fourth Amendment discussion, say nothing of the grounds on which social workers may act to seek emergency detention of children thought to be in need of services.

The plaintiffs also cite the Eleventh Circuit's *en banc* decision in *Taylor by and Through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) *cert. denied* — U.S. —, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), but that case affords no support for two reasons. First, the case's holding addressed the "circumstances, if any, [under which] a child involuntarily placed in a foster home may successfully bring an action in federal court against the state officials involved in the placement, for injuries sustained while in the foster home." 818 F.2d at 792. No injuries to the Millspaugh or Dyson children are alleged here.[12] Second, *Taylor* was decided in 1987, well after the events at issue here.[13]

In *Duchesne v. Sugarman,* 566 F.2d 817 (2nd Cir.1977), the court held that a mother whose child was taken by welfare workers had a due process right to a judicial hearing when the children continued to be held over her objection. The court held that the defendants' original taking of the children did not offend due process, because an emergency existed as a result of the mother's psychiatric commitment. Once that emergency passed, however, the mother was entitled to a hearing. Ms. Tucker, unlike the defendants in *Duchesne,* did not attempt to hold the children without a judicial hearing; indeed, the children were physically taken from their mothers only upon order of a court.

Certainly, the plaintiffs were constitutionally entitled to notice of the proceedings involving their children, and that right was clearly defined in 1984. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The plaintiffs, however, have identified no authority for the proposition that Ms. Tucker, as the person who initiated the court proceedings, bore the burden of providing the plaintiffs with notice. IND.CODE 31–6–4–10(f) provides that if, following the prosecutor's filing of a CHINS petition, the court grants the request to have a child taken into custody, the court shall proceed in accordance with IND.CODE 31–6–4–6(e), which provides simply that, "Notice shall also be given to his parent, guardian, or custodian if he can be located." Under Indiana law, a summons ordinarily is to be served by a sheriff or someone specially or regularly appointed by the court for that purpose. IND.TR.R. 4.12(a).

■ Liability under 42 U.S.C. § 1983 requires that the defendant have participated personally in the constitutional deprivation. *Morales v. Cadena,* 825 F.2d 1095 (7th Cir.1987); *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986). The plaintiffs have come forth with no case suggesting that one involved in any civil litigation is personally liable for another parties' lack of notice from the court. Further, even assuming that Ms. Tucker bore some constitutionally

---

12. Similarly, *Doe v. New York Dept. of Social Services,* 649 F.2d 134 (2nd Cir.1981), *op'n foll'g remand* 709 F.2d 782 (2nd Cir.), *cert. denied* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), addressed the defendants' failure to remove a child from a foster home after reports of sexual abuse.

13. In *Doe v. Bobbitt,* 881 F.2d 510 (7th Cir.1989), the court discounted *Taylor* due to its recency in determining whether "in early 1984 a substantial consensus had been reached that placing a child in a potentially dangerous environment in a foster home was a violation of the due process clause." 881 F.2d at 511, 512 n. 3.

obligation with respect to notice to the plaintiffs, nothing in the record supports an inference that the failure to give notice was intentional; Ms. Tucker cannot be held liable under § 1983 for negligent failure to give notice. See *Brunken v. Lance,* 807 F.2d 1325, 1331 (7th Cir.1986). Finally, the plaintiffs have not demonstrated any actual harm for which they do not share principal responsibility. See *People of State of Illinois ex rel. Hartigan v. Peters,* 871 F.2d 1336, 1341 (7th Cir.1989) ("Peters was given a full and fair hearing once he came before the court, minimizing the effect of any possible defects in notice."). Reasonable conduct is not an unconstitutional condition of notice. See *Lehr v. Robertson,* 463 U.S. 248, 264–265, 103 S.Ct. 2985, 2994–95, 77 L.Ed.2d 614 (1983).

■ For the foregoing reasons, the court concludes that the plaintiffs have not identified relevant decisional law clearly establishing constitutional rights that Ms. Tucker might be found to have violated. Further, the undisputed facts indicate that Ms. Tucker's conduct as a child welfare worker was not so shocking or outrageous as to constitute an obvious constitutional deprivation notwithstanding the absence of such case authority.

Ms. Tucker attempted to investigate the potential CHINS status of the plaintiffs' daughters, although the plaintiffs' flight from Wabash County hindered her investigatory efforts. Ms. Tucker cannot be blamed for any deficiencies attributable to the children's absence resulting from the mothers' actions. See *Mazanec v. North Judson–San Pierre School Corp.,* 798 F.2d 230 (7th Cir.1986). Her investigative efforts included discussions with neighbors, school officials, and an inspection of the children's former residence. She also spoke with Rev. Merrill, who recently had seen the children and their condition. All of the information received confirmed that: 1) the children had lived in a communal family atmosphere in Wabash County in which they complained of insufficient food and clothing, 2) the living conditions were consistent with the beliefs of the religion observed by their mothers, 3) the plaintiffs

had no permanent plans for residence or housing in their new location, 4) the children had been removed from school without notice, and 5) no plans for substitute education had been made.

Based on the knowledge acquired through these inquiries, Ms. Tucker recommended and assisted in the filing of CHINS petitions, securing a court-ordered removal of the children from the plaintiffs. While Ms. Tucker might have waited or pursued other investigative avenues before making the decision to file or accomplished the filing, her actions cannot be viewed as objectively unreasonable in these circumstances. The children's upbringing had been unorthodox and there was clearly concern for their welfare in the community that had observed such a family atmosphere. Moreover, Ms. Tucker's involvement in these cases was not superficial. She herself travelled with a family friend, Paul Wildridge, to Indianapolis to transport the children back to Wabash and during the children's stay in foster care was in contact with their mothers on several occasions in an apparent attempt to keep them informed of their rights. Acting within her grant of discretion in the investigation of these cases, Ms. Tucker cannot be held accountable for any wrong inadvertently caused the plaintiffs.

One of the plaintiffs' First Amendment claims attacks Ms. Tucker for suggesting that Ms. Millspaugh and Ms. Dyson would have to surrender their religious views in order to keep their daughters. The relevant facts here demonstrate that during a telephone conversation between Ms. Millspaugh and Ms. Tucker, the caseworker indicated that those factors to be considered by the judge in a CHINS proceeding include the stability of the household, living conditions including the adequate provision of food and clothing, and educational provision. While Lois Millspaugh may have interpreted such a communication as indicating that she would have to abandon the Faith Ministries to regain custody of her children, this conclusion is not implicit in Ms. Tucker's communication. Moreover, the information provided to Ms. Millspaugh is consistent with that used by the Depart-

ment and the Indiana courts in CHINS proceedings. IND.CODE 31-6-4-3. Ms. Tucker's conduct in this regard was not unreasonable or inappropriate within her duties.

The plaintiffs have suggested no set of facts that demonstrate the unreasonableness of Ms. Tucker's conduct in the CHINS proceedings regarding the Millspaugh and Dyson children. To the contrary, it appears that Ms. Tucker accomplished her duties as a caseworker in these matters with care, attempting as best she could to contact the parents and relay the circumstances of the cases. Acting within the confines of her official position, defendant Manetta Tucker is immune from liability in these cases.

## V. Defendant Wabash County Welfare Department's Motion for Summary Judgment

### A. Arguments of the Parties

The Wabash County Welfare Department makes several arguments on summary judgment, some of which parallel Ms. Tucker's position. In general response to the actions, the Department argues that the plaintiffs themselves bear the responsibility for the events at issue: (1) the plaintiffs have failed to demonstrate causation of any constitutional injury or civil rights remedy in light of the plaintiffs' failure to appear at proceedings concerning their children; and (2) any right to be heard was waived by such failure to appear. The plaintiffs make no specific response to these assertions.

A majority of the Department's arguments address the various due process constitutional arguments brought under §§ 1983 and 1985. The Department basically argues that any injury the plaintiffs may have suffered as a result of lack of sufficient notice, failure to serve process, inadequacies in the CHINS disposition, detention or fact-finding hearings were not the result of an official policy or custom of the Department and that any actions that were taken were appropriately conducted under the rules, regulations, and adminis-

trative directives of the Indiana Department of Public Welfare.

The plaintiffs do not directly challenge the legal standard offered by the Department, but rather claim that those illegal actions taken were done under the Department's policy with deliberate indifference to their rights. Specifically, the plaintiffs allege that certain actions taken pursuant to departmental policy were unreasonable in their cases: (1) emergency action taken to detain their daughters; (2) minimal efforts to give notice of hearing dates and serve process; (3) failure to give notice by publication; (4) failure to make reasonable efforts to investigate before detention; (5) continuation of the CHINS case following physical and psychological exams of the children that revealed no irregularities and school inquiries that demonstrated competent performance of the daughters; and (6) blind reliance on anonymous information and newspaper stories with little independent confirmation. The plaintiffs also argue that the Department's involvement in these proceedings constitutes policy-making.

The Department also contends that no § 671 action can be maintained because adequate case plans were developed in the Dyson and Millspaugh cases pursuant to that statute. Moreover, the Department asserts that any unavailability of that information or failure to provide the plaintiffs with copies of the case plans resulted from the plaintiffs' own conduct and hence is not attributable to the Department. The plaintiffs' position that the case plans were inadequate relies on their arguments regarding failure to investigate these matters sufficiently before filing CHINS petitions.

Finally, although the Department does not directly address the First Amendment religion claim, the right to privacy claim, or the Fourth Amendment claim, it suggests a lack of viability of all of the plaintiffs' constitutional claims in general based on the arguments, outlined above, of lack of causation, waiver of notice, and contravention of Department policy. The plaintiffs contend that departmental policy was di-

rectly applied in their children's cases in contravention of constitutional law. Specifically, with regard to the freedom of religion claim, the plaintiffs attribute the defendants with deliberate application of their policies so as to curtail the plaintiffs' religious practices.

Since both the Millspaugh and the Dyson causes of action (including the numerous claims) arise under 42 U.S.C. § 1983, the court will first address the defenses of a governmental authority raised under that statute. Ultimately, these defenses demonstrate how the law divorces the Department from any liability in these causes.

### B. Applicable Law for § 1983—Due Process Claims

As an arm of the Wabash County government, the Department can be held liable in a civil action brought under 42 U.S.C. § 1983. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1979), the Supreme Court revisited and revised its prior ruling in *Monroe v. Pape*, 365 U.S. 167, 181, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961). While *Monroe v. Pape* had held that, "Congress did not undertake to bring municipal corporations within the ambit of" § 1983, *Monell* held that local governments may be held responsible when their official policies cause their employees to violate another's constitutional rights even when the policies have not received formal approval through the bodies' official making channels. 436 U.S. at 691, 98 S.Ct. at 2036. The *Monell* Court did not recognize governmental liability under § 1983 on a theory of *respondeat superior*, but rather "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983". 436 U.S. at 694, 98 S.Ct. at 2037; *Archie v. City of Racine*, 847 F.2d 1211, 1214 (7th Cir.1988); *Gray v. Dane County*, 854 F.2d 179, 182–184 (7th Cir.1988); *Rascon v. Hardiman*,

803 F.2d 269, 274 (7th Cir.1986); *Woods v. City of Michigan City, Ind.*, 685 F.Supp. 1457, 1462 (N.D.Ind.1988).

The Department's official policies with respect to the CHINS proceedings conducted in these causes are those established by statutes, rules, regulations, and administrative directives authorized under Indiana law. Those Indiana statutes controlling Department policy include IND.CODE 31–6–4–1 *et seq.* Additionally, the Indiana Department of Public Welfare ("IDPW"), establishes its own set of directives in accordance with Indiana law to guide welfare workers in carrying out their jobs. Many of those rules and regulations are specifically set forth in the IDPW Manual for Child Welfare/Social Services provided for each agency and its officials. To establish their claims under § 1983 then, plaintiffs must show that their rights were violated through those official policies or some other conduct shown to be official policy of the Department.

An examination of the policies and directives of the IDPW manual reveals support for the conduct of CHINS proceedings in these matters. Sections 204 and 205 provide procedures for the intake of information and the general procedures to follow in investigating a potential CHINS. Section 204.10 specifically permits accepting and giving credence to reports from anonymous sources. Investigative avenues outlined in Section 205.4 include the emergency removal of a child as authorized by court order in the course of conducting the investigation. *See also* IND.CODE 31–6–4–4. The other investigative procedures listed (interview with child, medical or psychological examination, collateral contacts and assessment of risk to child)[14] were accomplished by the Department as soon as practicable in these cases. Notably, though, Section 205.7 dictates that investigations and reports of CHINS cases should be conducted in the county where the alleged abuse took place. Section 305 of the IDPW manual requires a determination of

---

**14.** The remaining suggested procedure, home visit, was not easily obtained due to the mobility of the plaintiffs' home.

probable cause for CHINS proceedings before such are instituted or pursued. *See also* IND.CODE 31–6–4–3; *Wardship of Nahrwold v. Department of Public of Allen County*, 427 N.E.2d 474 (Ind.App. 1981).

There is no evidence to suggest that the Department failed to follow the above listed procedures in their conduct of the Millspaugh and Dyson investigations and institution of proceedings. To the contrary, the evidence at hand suggests that the investigation was conducted as best as practicable under the circumstances and that Department officials made the probable cause determination required by law before proceeding further. *See* IND.CODE 31–6–4–7 and IND.CODE 31–6–4–8. However, even if the Department or its officials failed to conformed to these dictates, such does not give rise to § 1983 liability. To establish that linkage, the plaintiffs must establish that their allegations and grievances emanate from some policy or custom attributable to the Department.

■■■■ Post–*Monell* cases have further defined the range of governmental official conduct attributable to the agency or local body as a whole. For instance, the Court has held further that a single decision taken by the highest officials responsible for setting policy in that area of the government's business can be attributed to the municipality for purposes of § 1983. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Single decisions made by decision-makers with final authority to establish local governmental policy can also be attributable to the governmental authority under § 1983. *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Whether an official has final policy-making authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Generally, proof of a single incident of unconstitu-

tional activity is insufficient to impose municipal liability unless there is proof that it was caused by an existing municipal policy attributable to a municipal policy-maker. *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1984).

■■■ Several Wabash County welfare employees were engaged in official activities related to these actions. Besides Ms. Tucker, the evidence suggests the involvement of Welfare Department attorney Steve Downs and the departmental supervisor. However, none of these persons made or established policy in their actions. Rather, their conduct amounted to that normally engaged in in the course of their duties: conducting CHINS-related investigations, determining if probable cause exists to proceed further, and participating in CHINS proceedings. While the plaintiffs may question the completeness of the investigation and challenge the existence of probable cause, they have not demonstrated facts that could lead a reasonable trier of the facts to find that departmental policy resulted in faulty investigations or an improper basis to pursue CHINS cases. If such defects arose in the investigation and filing of CHINS petitions in the Millspaugh and Dyson cases, it was not due to Departmental policy or decisions by Department policy-makers, but rather to practices outside of the policy dictates under Indiana statutes and IDPW directives. See generally *Adamson v. Volkmer*, 680 F.Supp. 1191 (N.D.Ill.1987).

A similar line of analysis follows with regard to the service of process on, and notice to, the plaintiffs and evidentiary proceedings held in the CHINS cases. The plaintiffs maintain that the defendants should be faulted with providing inadequate notice of the proceedings in their daughters' cases. The record, however, reveals the plaintiffs' knowledge of the various proceedings via their phone calls shortly before or after the hearings occurred.[15] Further, the plaintiffs accentuated the dif-

---

15. The defendants report that notice was at least attempted on Mr. Paul Wildridge as requested by the plaintiffs, who deny that such service was accomplished as they had requested. The Department conceded that notice to Mr. Wildridge was returned unserved. Nonetheless, the plaintiffs appeared to have acquired knowledge of the various proceeding through some source.

ficulty in serving process with their frequent travels. Generally, however, the undisputed facts establish that the plaintiffs were on notice of the proceedings, that failure to accomplish service was not the fault of the Department, and that even if inadequacies in the service did exist, the inadequacies were not attributable to Department policy.

IND.CODE 31–6–4–6 provides that notice must be given of post-deprivation hearings to parents upon detention of a child under court order. Here, however, the officer conducting the arrest was given that responsibility. To the extent the detaining officers did not provide adequate notice to Lois Millspaugh and Tina Dyson, it was neither the fault of the Department nor in accordance with policy as dictated by statute. Generally, though, the plaintiffs have failed to demonstrate any damage resulting from the failure to serve process; the record indicates that knowledge of the proceedings existed regardless of successful service. See *Donald v. Polk County*, 836 F.2d 376 (7th Cir.1988) (no violation of due process rights under § 1983 could be maintained where plaintiffs suffered no actual damages from failure to give notice of dispositional hearing).

The plaintiffs also challenge the sufficiency of notice regarding other CHINS proceedings conducted with respect to their daughters. IND.CODE 31–6–7–5, along with IDPW manual Section 306.1, sets forth time requirements for service of process at the different stages of a CHINS case. The statute and the manual section speak of time limits of at least three days for personal service and ten days for service by mail, but there is no formal policy or statutory design as to how such service may or must be accomplished.

The plaintiffs fault the defendants for not attempting service by publication.

While the type of notice is not set forth in a policy or directive (and hence the department officials would appear to have discretion in this procedure), it is unlikely that departmental officials create a policy or custom for effecting service for each case. There is no evidence to suggest that Welfare Department attorney Steve Downs had such policy-making capacity. Even so, given the plaintiffs' travels during the pendency of the CHINS cases, it can hardly be argued that publication in a Wabash County newspaper would have informed them better of hearing dates and of their parental rights in the proceedings. The plaintiffs have not demonstrated a causal connection between inadequate service and their alleged deprivations. See *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir.1985); *Muckway v. Craft*, 789 F.2d 517, 521 (7th Cir.1986).

With regard to the sufficiency of the fact-finding and dispositional proceedings in their daughters' CHINS cases, the plaintiffs argue that certain evidence was insufficient and/or suppressed by the defendants, that reports were not timely, and that hearing dates and times were rescheduled without notice. First, if these allegations are correct, they contravene departmental policy as provided in Indiana statutory law. Statutes and the IDPW manual specifically outline the requirements for preparation and filing of dispositional reports, IND.CODE 31–6–4–14; 31–6–4–15; 31–6–4–15.3 and Section 306 of the IDPW manual, and provide for the types of evidence necessary for proper review at a fact-finding hearing.[16] IND.CODE 31–6–4–13.5; 31–6–4–14; 31–6–7–13.

A number of complications burdened the Department and judicial officers in conducting these cases at the dispositional level: difficulty in establishing contact with Lois Millspaugh and Tina Dyson; Charles

---

16. Ms. Millspaugh's suppression argument appears to be directed, not to the fact-finding hearing, but to the initial hearing conducted on March 16, 1984, during which such evidence is premature. IND.CODE 31–6–4–13.5. As such, her legal position has no basis in fact or support under statutory requirements for such hearings. Ms. Dyson's suppression argument focuses on the dispositional phase of the CHINS proceedings, but she shows no facts suggesting that evidence of the physical and mental health of her children was suppressed. Based on the facts in the record, the physical and mental good health of all four of the children appears to be well-documented.

Millspaugh's appearance on behalf of his daughters; and lack of legal counsel representing the plaintiffs at the early stages. Hence, any nonconformities with those Department policies not only are non-actionable under § 1983, but may not even be attributable to the Department. Moreover, the plaintiffs have failed to trace the fault for the alleged scheduling difficulties directly to the defendants; certainly the scheduling of the CHINS proceedings and subsequent notice of the rescheduling are matters for the concern of the presiding court, not the Department.

In response to the Department's summary judgment motion, the plaintiffs have failed to demonstrate any causal connection between the Department's policies in conducting CHINS proceedings and the alleged deprivations. The allegations in the complaint do not stand without further factual support.

C. Constitutional Claims under the First and Fourth Amendments and the Right to Privacy

 Generally, as with those due process claims discussed above, the plaintiffs have failed to attribute the remaining constitutional violations alleged to Department policy.

The plaintiffs' claims under the First Amendment seem to focus on Ms. Tucker's statements to Ms. Millspaugh, discussed above, regarding the care of her daughters, Paula and Jean. The plaintiffs have not identified any other actions by the Department or its officials that suggest a violations of First Amendment rights, either with regard to the free exercise clause or free association clause.

Specifically, with regard to a parent's choice of religion, Department policy prohibits any prejudice based on religious beliefs. IND.CODE 31–6–4–3. Hence to the extent that any Department official conducted these CHINS proceedings with religious prejudicial motives, such practice was clearly adverse to established policy and non-actionable in these § 1983 actions against the Department. See *Adamson v. Volkmer*, 680 F.Supp. 1191.

Basically, though, the plaintiffs have not met their summary judgment burden of coming forward with evidence of religious motivation or of the defendants' violation of their right to freely associate. To the contrary, the plaintiffs continued to practice their religion and freely express themselves in this manner throughout the course of the CHINS proceedings. The plaintiffs have no actionable claims under the First Amendment.

The plaintiffs' Fourth Amendment claims are somewhat fuzzy. They appear to contend in their complaint that the defendants have in some way illegally seized their daughters, but give no factual basis for the accusation or legal support for the claim. Accordingly, the plaintiffs having failed to defend or support their Fourth Amendment claim on summary judgment, the court need not address the allegations further.

The plaintiffs also allege violations of their rights to privacy against the defendants in the course of the CHINS investigation and proceedings. While the law certainly recognizes such a right in relation to the family, it has also limited the scope of such privacy rights, balancing them against the state's interests in children and their rights. *Pesce v. J. Sterling Norton High School*, 830 F.2d 789 (7th Cir.1987); *Dayton v. State*, 501 N.E.2d 482 (Ind.App. 1986); *Brown v. Brown*, 463 N.E.2d 310 (Ind.App.1984). CHINS proceedings are one example of an instance in which the law recognizes the state's interest in protection of children and will limit parental rights when the appropriateness of the care given a child is questioned. *Matter of Joseph*, 416 N.E.2d 857 (Ind.App.1981); *Wardship of Nahrwold v. Department of Public Welfare of Allen County*, 427 N.E.2d 474 (Ind.App.1981).

As discussed above, the plaintiffs have not demonstrated how the Department's conduct of these CHINS proceedings in any way violated the statutory requirements or established alternative policy in violation of the plaintiffs' rights to privacy. Indiana statutory law in this area was established to assure the protection of parental rights against the balance of the state's *parental*

*patriae* where the child is concerned. IND.CODE 41–6–4–1 *et seq.* The plaintiffs have been afforded those protections of their parental rights under these statutes; no other remedy is available before this court.

### D. Additional Statutory Claims

Aside from their basic causes of action under 42 U.S.C. 1983, the plaintiffs also raise claims under "color of state law" pursuant to other federal statutes. The plaintiffs' original claims under 42 U.S.C. § 1981 were voluntarily dismissed without objection at the hearing on these motions. Additional claims based on 42 U.S.C. §§ 1985 and 671 remain pending.

The plaintiffs established no factual basis for their claims under § 1985, which addresses a "civil conspiracy under color of state law" in discrimination of the protected rights of an individual or group. The plaintiffs allege some sort of conspiracy against them and/or their religious group's practices by the officials of the Department. However, aside from those general allegations in the complaint, the plaintiffs have not established any facts suggestive of the discriminatory animus of the Department or, for that matter, any conspiracy in this regard to meet their burden on summary judgment.

■ To defeat a motion for summary judgment in an action under § 1985, a plaintiff must show at the very least a significant issue of material fact concerning the existence of a conspiracy, *Hewitt v. Grabicki,* 596 F.Supp. 297 (E.D.Wash. 1984), *aff'd* 794 F.2d 1373 (9th Cir.1985); *Lee v. Wyandotte County,* 586 F.Supp. 236 (D.Kan.1984); *Chicarelli v. Plymouth Garden Apts.,* 551 F.Supp. 532 (E.D.Pa. 1982), along with facts showing those actions that were a product of discriminatory animus on the part of the defendant, *Jafree v. Barber,* 689 F.2d 640 (7th Cir.1982); *Rynearson v. National Bank of Rochester,* 602 F.Supp. 1253 (N.D.Ind.1985); *Ekergren v. City of Chicago,* 538 F.Supp. 770 (N.D.Ill.1982); *Life Science Church v. Vocke,* 531 F.Supp. 790 (E.D.Wis.1982).

■ The plaintiffs' complaints and their briefs in response to summary judgment suggest that the Department has in some way monitored the plaintiffs' activities for some time in some conspiracy that flourished into the CHINS proceedings, but the plaintiffs have presented neither direct nor circumstantial evidence of these allegations. Rather, as discussed above, those actions of the Department appear in all respects in accordance with the statutory law and directives of the IDPW. The court must therefore find in favor of the defendants on summary judgment with respect to the § 1985 claims.

■ A similar analysis applies to the claims under § 671. That statute does not provide for a private cause of action, so the § 671 claims (as with the others brought by the plaintiffs) must be deemed raised, if at all [17], under § 1983. In accordance with the *Monell* line of cases discussed above then, the plaintiffs must establish a connection between the violations alleged and the policies or customs of the Department. Again, Ms. Millspaugh and Ms. Dyson have failed to make this crucial legal connection.

42 U.S.C. § 671 sets forth requirements for state agencies in their administration of foster care and adoptive assistance programs. In accordance with those federal mandates, the IDPW manual gives specific requirements for the development of a case plan as part of CHINS proceedings in the State of Indiana. Specifically, Section 306 of that manual provides for the completion of case plans within sixty days after detention of the children and for various other items that should be discussed and evaluated as a part of the case plan.

The plaintiffs' claims under § 671 are basically three-fold: (1) that the Department failed to complete the case plan within the required time period; (2) that the plaintiffs were not provided with copies of

---

17. That § 671 creates a statutory right on a parent's behalf, as opposed to the child's behalf, is not intuitively obvious. Nonetheless, the Department has not challenged the plaintiffs' § 671 claims on standing grounds, so the court will assume, without holding, that these plaintiffs may maintain such claims.

**850**

the case plans upon its completion or involved in their preparation; and (3) that the final case plans were inadequate in their description of services offered as an alternative to removal of the children. The untimeliness of completion and provision of copies to the plaintiffs arose from the plaintiffs' absence from the Wabash County area during the early pendency of the CHINS proceedings. Hence any delays on the Department's part in providing the report to the plaintiffs or failure to include them in the completion are not attributable to the conduct of the Department. Additionally, any delays or inadequacies were anomalies, not in accordance with departmental policy, and not actionable under § 1983.

With regard to the third of the § 671 claims, the plaintiffs apparently fault the Department for failing to invoke certain emergency procedures under IDPW manual Section 306.621 for immediate return of the children, including: provision of a substitute emergency caretaker, counselling services, and emergency shelters. To the extent that the Department did not attempt to apply these procedures as an alternative to removal, its actions were not in accordance with departmental policy and hence raise no actionable claim under § 1983. If, however, the officials of the Department simply determined that the alternative procedures were inadequate in these cases (particularly given the flight of the Millspaugh and Dyson families), those determinations would have been within the Department's province on a case-by-case basis as a part of the CHINS investigative proceedings. The plaintiffs have not demonstrated how the determinations made in these cases established policy or, for that matter, were unreasonable in any respect. As with the other claims under § 1983, the plaintiffs have again failed to meet their burden on summary judgment with respect to those assertions made in reliance on 42 U.S.C. § 671.

### VI. Conclusion

For all of the foregoing reasons, the court hereby GRANTS the motions for summary judgment of defendants Manetta Tucker and the Wabash County Department of Public Welfare with respect to all claims brought by the plaintiffs and DISMISSES these actions.

SO ORDERED.